UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



13  CV  5488

| | |
|---|---|
| ARROW PRODUCTIONS, LTD., <br><br>           Plaintiff, <br><br> - against - <br><br> THE WEINSTEIN COMPANY LLC, RADIUS-TWC, MILLENNIUM FILMS, INC., NU IMAGE, INC., ANIMUS FILMS, LLC, UNTITLED ENTERTAINMENT, INC., ECLECTIC PICTURES, INC., AVI LERNER, LAURA RISTER, and JOHN DOES 1 through 100; <br><br>           Defendants. | No. _____ <br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

As and for its complaint, Plaintiff Arrow Productions, Ltd. ("Arrow" or "Plaintiff"), states through its attorneys as follows:

### PRELIMINARY STATEMENT

1.     This is an action to preliminarily and permanently enjoin the distribution of a film entitled *Lovelace*, which the Defendants to this lawsuit have produced and are about to distribute in the United States.  *Lovelace* infringes upon the copyright and trademarks that Plaintiff owns in *Deep Throat*, the landmark 1972 film, and in Linda Lovelace, the iconic fictional protagonist of the film.

2.     More than five minutes of footage in *Lovelace* are copyrighted material taken from *Deep Throat*.  Defendants use that footage without license or permission.  In fact, the title *Lovelace* derives its market appeal entirely from decades of cultural cache embodied in the trademarked name Linda Lovelace.  Defendants use that title without license or permission.

1

3.      Arrow is in the business, among other things, of licensing the intellectual property that it owns in *Deep Throat*. When it negotiates a license to that IP, Arrow looks not only to generate revenue in the short term, but also to preserve the value of the *Deep Throat* brand in the long term. Rather than negotiating licenses for *Deep Throat* IP, rather than deferring to Arrow's vision for the *Deep Throat* brand, Defendants have simply taken what they wanted and crossed their fingers. Evidently their hope was that by the time Arrow noticed the theft, *Lovelace* would be a fait accompli. Defendants must be enjoined.

## THE PARTIES

4.      Plaintiff Arrow Productions, Ltd. is a Nevada corporation located at 631 Las Vegas Boulevard South, Las Vegas, Nevada, 89101.

5.      Upon information and belief, Defendant The Weinstein Company LLC, is a Delaware Limited Liability Corporation with offices located at 375 Greenwich Street, New York, New York 10013. Upon information and belief, Defendant Radius-TWC is an unincorporated business entity that is owned and controlled by Defendant The Weinstein Company, Inc., with offices located at 375 Greenwich Street, New York, New York 10013. Upon information and belief, Radius-TWC is the U.S. distributor of *Lovelace*.

6.      Upon information and belief, Defendant Millennium Films, Inc., is a California Corporation with offices at 6423 Wilshire Boulevard, Los Angeles, California, 90048. Upon information and belief, Millennium Films, Inc. is one of the producers of *Lovelace*.

7.      Upon information and belief, Defendant Nu Image, Inc., is a California Corporation with offices at 6423 Wilshire Boulevard, Los Angeles, California, 90048. Upon information and belief, Nu Image, Inc. is one of the producers of *Lovelace* and is an *alter ego* of Millennium Films, Inc..

8.      Upon information and belief, Defendant Animus Films, LLC, is a California LLC with offices at 914 Hauser Boulevard, Los Angeles, California, 90036.  Upon information and belief, Animus Films, LLC is one of the producers of *Lovelace.*

9.      Upon information and belief, Defendant Untitled Entertainment, Inc., is a New York corporation with offices in Manhattan, at with a registered agent Anthony Bonsignore, Altman, Greenfield & Selvaggi, 200 Park Ave. South, 8th Floor, New York, New York, 10003.  Upon information and belief, Untitled Entertainment, Inc. is one of the producers of *Lovelace.*

10.     Upon information and belief, Defendant Eclectic Pictures, Inc., is a California corporation with offices at 9777 Wilshire Boulevard, Suite 700, Beverley Hills, California, 90212.  Upon information and belief, Untitled Entertainment, Inc. is one of the producers of *Lovelace.*

11.     Upon information and belief, Defendant Avi Lerner is an individual residing in the States of New York and California, and is the Chairman and founder of Defendants Millennium Films, Inc, and Nu Image, Inc.  Lerner is one of the producers of *Lovelace.*

12.     Upon information and belief, Defendant Laura Rister is an individual residing in the State of New York, is the head of production at Defendant Untitled Entertainment, Inc., and is one of the producers of *Lovelace.*

13.     Upon information and belief, individuals other than the named Defendants are involved in the copyright and trademark infringement described in this Complaint.  The true names and capacities of those individuals are unknown to Plaintiff.  Consequently they are referred to herein as John Does 1 through 50.  Plaintiff will seek leave to amend this complaint to show their names and capacities when they are ascertained.

3

14.     Upon information and belief, entities other than the named Defendants are involved in the copyright and trademark infringement described in this Complaint. The true names, forms and capacities of those entities are unknown to Plaintiff. Consequently they are referred to herein as John Does 51 through 100. Plaintiff will seek leave to amend this complaint to show their names, forms and capacities when they are ascertained.

### JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

16.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that Plaintiff is a citizen of the State of Nevada, in that upon information and belief none of Defendants are citizens of the State of Nevada, and in that the matter in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the instant claims occurred in New York, New York.

18.     Upon information and belief, this Court has personal jurisdiction over Defendants The Weinstein Company LLC, Radius-TWC, Untitled Entertainment, Inc., and Laura Rister because they reside in New York.

19.     Upon information and belief, this Court has personal jurisdiction over all Defendants because they conduct substantial business in the State of New York.

## GENERAL ALLEGATIONS

**The Film *Deep Throat* and Arrow's I.P. Interests**

20.      *Deep Throat* was filmed in or about 1972.  Its release was a watershed moment for American culture.  In the 1970s and after, *Deep Throat* helped changed American mores regarding pornography.  *Deep Throat* has enjoyed immense popularity since it was first made.

21.      *Deep Throat* was created and directed by the late Gerard Damiano as a work for hire of the predecessor to Plaintiff Arrow.

22.      *Deep Throat* was filmed on color motion picture film.  In motion picture parlance, an "internegative" is motion picture film stock used to make release prints for distribution to movie theaters.  After a film is shot, the original negatives (taken directly from the camera equipment) are edited into correct sequence and printed onto fresh stock as a cohesive film, creating an interpositive print used for color timing.  From the interpositive, answer prints, which include the color-corrected imagery and a properly synced sound track are made.  Once approved by the studio, the final answer print is made into an internegative used for striking copies that will be delivered to theaters for viewing.  Arrow remains in possession of the internegative of *Deep Throat.*

23.      After *Deep Throat* was made and answer prints struck, Arrow (and/or its predecessors) maintained control of all of those prints. Each time *Deep Throat* played in a theatre, the print never left Arrow's (and/or its predecessors') control.  Rather, it was "four-walled," meaning that Arrow's employees (and/or its predecessors' employees) rented the theater, sold tickets to the theatergoers, collected the tickets and operated the projector.

24.     Therefore the theatrical exhibition of the motion picture by Arrow (and/or its predecessors) did not constitute "publication" under the Copyright Act, so no copyright notice was required to be affixed to the work.

25.     When home videotape was introduced in the late 1970s, Arrow (and/or its predecessors) created videotapes of *Deep Throat*, which always contained a copyright notice as required. By that time, all prints also contained a copyright notice.

26.     The first time that Arrow (and/or its predecessors) voluntarily relinquished control of any copy of *Deep Throat* was on videotape or disc, and those videotapes and discs all included copyright notices.  Arrow has from time to time been made aware of pirated copies of *Deep Throat*, that is, copies made without Arrow's permission and in violation of Arrow's copyright.  Arrow has sought vigilantly to enjoin their distribution and sale.

27.     *Deep Throat* was registered with the Copyright office on March 5, 1979 and March 19, 1979 by Arrow's predecessors, and the Copyright Office issued registration numbers PA24-166 and PA25-575.  Attached as Exhibits A and B are true and correct copies of these copyright registrations.

28.     "Deep Throat" is a mark registered with the United States Patent and Trademark Office, Registration Number 2993913.  Attached as Exhibit C is a true and correct copy of the trademark registration.  The Deep Throat mark is a famous trademark, as that term is defined and understood under 15 U.S.C. § 1125(c).

29.     The central character in *Deep Throat* is Linda Lovelace.  The Linda Lovelace character is an icon of American cinema, and among the most famous figures in all pornography.  The character Linda Lovelace is an inextricably part of the *Deep Throat* brand. For example, *Deep Throat* has consistently been billed as "Starring Linda Lovelace."

6

30.     Linda Lovelace was portrayed in that original motion picture by an actress whose real name at that time was Linda Susan Boreman Traynor ("Boreman").  Boreman died in April 2002.

31.     "Linda Lovelace" is a mark registered with the United States Patent and Trademark Office, Registration Number 4095397 and 3691818. .  Attached as Exhibits D and E are true and correct copies of the trademark registrations.  The Linda Lovelace mark is a famous trademark, as that term is defined and understood under 15 U.S.C. § 1125(c).

32.     In sum, Arrow owns the copyright on *Deep Throat* and the trademark rights to the Deep Throat mark and the Linda Lovelace mark.

**Arrow Licenses and Develops Its Intellectual Property Interests in *Deep Throat***

33.     Arrow (and/or its predecessors) have repeatedly exercised their right to make derivative works based upon *Deep Throat*.  For example, numerous subsequent motion pictures have been made and released by Arrow (and/or its predecessors) that have carried the title *Deep Throat*, including *Deep Throat #2* through *Deep Throat #6,* and a sequence of movies subtitled *Deep Throat, the Quest*.  Movies have also been made and released by Arrow with "Linda Lovelace" in the title.

34.     Arrow has also entered into various licensing agreements with third parties, to further realize the value of its IP and to further develop the *Deep Throat* brand.  For example, Arrow has licensed adult apparel and an energy drink, all using either the Deep Throat or the Linda Lovelace marks.

35.     Arrow is periodically approached by filmmakers who are interested in using footage from the film or copying scenes or other aspects of *Deep Throat*.  With three exceptions, the filmmakers have been interested in making a documentary.

36.     When Arrow receives such an inquiry from a filmmaker, Arrow investigates both the filmmaker and the work that the filmmaker is proposing to create in order to determine how the work will affect the *Deep Throat* brand and Arrow's ability to maximize the value of the *Deep Throat* I.P.

37.     Arrow considers a number of factors, including whether Arrow is engaged in a competing project and how the proposed work will portray the *Deep Throat* film and the actors and others involved in the production of the film.  Arrow will not license *Deep Throat* without first ensuring that it will be portrayed fairly and accurately.  If Arrow concludes that the proposed work will not harm Arrow or the *Deep Throat* brand, then it will enter into a negotiation with the filmmaker (or the filmmaker's representative) about the terms of a license.

38.     Licensing *Deep Throat* is particularly sensitive given the extensive controversy that has surrounded the film.  For example, after the film was released, Linda Boreman claimed that she participated in the film only after being threatened with violence and being placed under duress.  Boreman later recanted those claims.  But *Deep Throat* has suffered far more controversy than the typical film does and it has been harmed far more than the typical film has been by untrue and unfair attacks and mischaracterizations.

39.     Every time *Deep Throat* is the subject of further cinematographic and/or media attention, there is a substantial possibility that artists and/or journalists will repeat the falsehoods and mischaracterizations that have victimized *Deep Throat* in the past without placing the incorrect information in the correct context, thus causing further harm to *Deep Throat*.  For this reason, protecting the cultural and economic value of the intellectual property in *Deep Throat* requires a very careful and thoughtful assessment of how any future use of those intellectual property rights will affect the *Deep Throat* brand.

40.     For example, several years ago, Arrow licensed the playwright and entrepreneur David Bertolino to produce a theatrical play entitled *The Deep Throat Sex Scandal,* about the making of *Deep Throat* and about the ensuing obscenity litigation.  Among other things, the license permitted Bertolino to use footage from *Deep Throat* and to use the Deep Throat and Linda Lovelace trademarks in the play and in connection with marketing the play.  The play was successful, and Arrow concluded that it was a credit to the *Deep Throat* brand.  Arrow and Bertolino have now come to an agreement that grants Mr. Bertolino a license to produce a movie version of *The Deep Throat Sex Scandal.*

41.     In addition to the license issued to Mr. Bertolino, Arrow has only agreed to license *Deep Throat* for use in films that were not documentaries on two other occasions.  First, Arrow issued a license to Showtime.  Because Arrow was concerned about how the Showtime film would affect the *Deep Throat* brand, Arrow negotiated two protections into the license agreement:  (a) Arrow's President, Raymond Pistol, would serve as a producer for the film and would have creative input and (b) Arrow had an option to purchase the film for a very modest sum ($125,000) so that Arrow could prevent the film from being distributed in the event Arrow believed that the film would hurt the *Deep Throat* brand.

42.     Second, Arrow licensed *Deep Throat* for the purpose of creating a non-documentary film titled *Inferno*.  *Inferno* was to be a film about the actress Linda Boreman.  Together with its partners, Arrow put together a draft script (with intense oversight from Arrow's President, Raymond Pistol).  Matthew Wilder was hired to direct the film, and the actress Lindsey Lohan was hired to play the role of Linda Boreman.

43.     Arrow and its partners made significant progress in raising the funds needed to make *Inferno*.

9

44.     However, in or around 2010, the entertainment press began reporting that Defendant Avi Lerner and others were working on a similar film about Linda Boreman, with the working title *Lovelace*.  Once the press started to report on *Lovelace*, funding for *Inferno* dried up.  When it comes to the movie industry, the spoils usually go to the swift and, as a result, people are rarely willing to fund a film that is going to arrive at theatres shortly after another film on the same subject.

**The Film *Lovelace***

45.     Arrow and its partners were surprised to hear about *Lovelace*, because no one had approached Arrow for a license to use any of Arrow's intellectual property.  At that time, Arrow did not know the plot of *Lovelace*, nor did it realize the extent to which the film would address *Deep Throat*.

46.     Although Arrow did not know the plot of *Lovelace* or the approach that the makers of the film were taking, Arrow believed that there was a real possibility that *Lovelace* was infringing Arrow's intellectual property rights.  As a result, on December 12, 2010, counsel for Arrow sent correspondence to Defendants Nu Image, Inc. and Millennium Films, Inc., care of Defendant Ari Lerner (and his business affairs representative Lonnie Ramati).  Arrow then believed Defendants Nu Image, Inc. and Millennium Films, Inc. were solely responsible for producing *Lovelace*.  Mr. Ramati responded with a brief email, which argued that Arrow's position was "total nonsense."  A true and correct copy of this email exchange is attached as Exhibit F.

47.     In light of Defendants Nu Image, Inc. and Millennium Films, Inc.'s unwillingness to respond to Arrow's concerns, Arrow sent a formal cease and desist letter on December 15, 2010, a true and correct copy of which is attached as Exhibit G.

48.     Arrow did not know when or if Defendants Nu Image, Inc. and Millennium Films, Inc. would respond to the cease and desist letter.  When Arrow didn't hear from them for approximately a year, counsel for Arrow sent a follow-up cease and desist letter. The follow-up letter was sent on November 11, 2011.  A true and correct copy of this letter is attached hereto as Exhibit H.

49.     Counsel for Arrow finally received a written response on or about December 1, 2011, a true and correct copy of which is attached hereto at Exhibit I.   This letter was sent by counsel for "Nu Image and Millennium Productions and the producers of the motion picture presently titled 'Lovelace'".  (Id. at 1.)

50.     The December 1 letter was the first time that Arrow learned that *Lovelace* included "the re-creation of a short scene from 'Deep Throat' and the brief reenactment of the filming of scenes of 'Deep Throat.'"  (Id. at 2.)

51.     After Arrow received the December 1 letter, Arrow's President, Raymond Pistol, received a call from Eric Danville, the author of a biography of Linda Boreman.  Mr. Danville said that he was calling on behalf of the producers of *Lovelace*.  He inquired as to whether Arrow would license the re-enactments in *Lovelace*.  He provided Mr. Pistol with the telephone number of a member of the production crew, in order to discuss the license.  Mr. Pistol called the telephone number and left a voicemail message for the crew member.  The message was never returned.

52.     Because Arrow believed the makers of *Lovelace* to be reputable cinematographers, Arrow assumed that they would have obtained a license from Arrow if they were going to copy more than a few seconds of *Deep Throat*.

11

53.     However, Arrow continued to attempt to see *Lovelace*. For example, shortly before the 2013 Sundance Film Festival, representatives for Arrow learned that *Lovelace* would be exhibited at Sundance. Arrow, however, was unable to procure tickets to the screening.

54.     After consulting with counsel, Arrow concluded that it could not take any further steps until it had a better understanding of whether and to what extent *Lovelace* infringed Arrow's intellectual property rights.

55.     In or about July 2013, Arrow's President, Raymond Pistol, received a telephone call from David Bertolino, the playwright and entrepreneur who had produced *The Deep Throat Sex Scandal*. Mr. Bertolino had just attended a screening of *Lovelace*. This was the first report Arrow received of the extent to which *Lovelace* made use of Arrow's *Deep Throat* I.P.

***Lovelace* Copies *Deep Throat***

56.     More than five minutes of footage in *Lovelace* is copyrighted material taken from *Deep Throat*. *Deep Throat* has a run-time of approximately 62 minutes. *Lovelace* has a run-time of approximately 92 minutes.

57.     *Lovelace* copies three scenes from *Deep Throat*. In each instance, the makers of *Lovelace* have recreated all of the copyrighted elements of each scene. They have reproduced dialogue word for word, positioned the actors identically or nearly identically, recreated camera angles and lighting, and reproduced costumes and settings.

58.     The first scene that *Lovelace* copies is the opening scene. *Deep Throat* opens with Linda Lovelace, driving down a road in a blue Cadillac. *Lovelace* opens in the exact same manner, and copies almost all of the cinematic details: the position of Lovelace in the car; the make and model of the car itself (except that the Cadillac in *Lovelace* is red); Lovelace's costume; and the road down which she is driving. The scene lasts approximately one minute in both films. The difference is that in *Lovelace* the scene is shot as a movie-within-a-move: an

actor playing Gerard Damiano (the director of *Deep Throat*) is portrayed giving instructions to the actor playing Linda Lovelace.

59.     The second scene *Lovelace* copies also occurs early in *Deep Throat*.  In the scene, Linda Lovelace walks in on a man performing oral sex on a character named Dolly Sharp in a kitchen.  The scene lasts approximately one minute and includes celebrated dialogue. *Lovelace* copies every single detail of this scene, including each and every word of dialogue.

60.     The third scene *Lovelace* copies is the most famous and iconic scene in *Deep Throat*—"the money shot," in film industry parlance.  The premise of *Deep Throat* is that Linda Lovelace cannot achieve sexual satisfaction because her clitoris is located in her throat. During the film's most famous scene, Dr. Young explains to Lovelace that she can achieve sexual satisfaction by performing oral sex, and proceeds to instruct Lovelace to perform oral sex on himself.  The scene lasts approximately three or four minutes, and culminates with both Lovelace and Young obtaining sexual satisfaction, and Young waving a flag.  *Lovelace* copies every single detail of this scene, including each and every word of dialogue.

61.     In addition to these three scenes, throughout its 91 minutes *Lovelace* makes extensive use of dialogue, characters, incidents, themes and motifs from *Deep Throat*.

62.     *Lovelace* misappropriates these three pivotal scenes from *Deep Throat*— including the opening scene, and the so-called money shot—in such a way as to decimate the value of the *Deep Throat* brand.   In conducting publicity for the upcoming release of *Lovelace*, the actors who starred in *Lovelace* have spoken extensively about *Deep Throat*, and have described *Deep Throat* as being a horrible and exploitative film.

63.     For example, in an appearance on the David Letterman show, the lead actress in *Lovelace* described the making of *Deep Throat* in exclusively negative terms:  "it was

pretty depressing, which is kind of why we made the movie." She went on to explain that Linda Boreman "got nothing, she got screwed." In response, Mr. Letterman characterized Ms. Boreman as a "hostage."

64.   For example, in an appearance on Comedy Central's Daily Show, a leading actor in *Lovelace* described Ms. Boreman's treatment as "horrible." Presumably in response to having seen or been provided with a summary of the film, the host of the Daily Show characterized Ms. Boreman's involvement in the film as follows: "[T]he reality . . . was appalling because she suffered deeply, was exploited on an incredible scale, and was not respected in any human form."

65.   Upon information and belief, *Lovelace* will be released in theaters in the United States on August 9, 2013. Upon information and belief, *Lovelace* will be distributed via a video on demand service and via Apple's iTunes store either simultaneously or subsequently.

### FIRST CAUSE OF ACTION (All Defendants)
### (Infringement of the Copyright of *Deep Throat*)

66.   Plaintiff re-alleges all of the paragraphs set forth above.

67.   Defendants had access to the original work of authorship, the film *Deep Throat*, of which tens of thousands of copies are in circulation.

68.   In their film *Lovelace*, Defendants have copied and reproduced at least five minutes of the film *Deep Throat*, including every copyrightable element of those five elements of *Deep Throat*: the scene and setting, the characters, the dialogue, the positions and movement of the actors, the lighting and framing of the shot ("the Relevant Copyrighted Material").

69.   Defendants violated specific, and/or are poised to violate, exclusive rights granted in section 106 (1)-(5) of the Copyright Act and owned by Plaintiff at the time of the

14

infringement, namely, reproducing the Relevant Copyrighted Material, preparing a derivative work based upon *Deep Throat*, distributing copies of the Relevant Copyrighted Material for sale or lease, performing the Relevant Copyrighted Material publicly, and displaying the Relevant Copyrighted Material publicly.

70.     The foregoing acts of infringement occurred within the statute of limitations period, namely, within three (3) years prior to the filing of this Complaint, and they continue.

71.     The statutory requirements of registration have been fulfilled, namely, in 1979 Plaintiff submitted the required registration forms, fee and deposit copy to the United States Copyright Office which thereafter issued copyright certificates.

72.     As a direct and proximate result thereof, Plaintiff has been damaged in an amount to be proven at trial.  Alternatively, Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504, as to be elected by Plaintiff.

73.     The injury that Plaintiff has suffered and will continue to suffer unless Defendants' acts of infringement are enjoined are irreparable.

74.     Plaintiff has no adequate remedy at law.

## SECOND CAUSE OF ACTION (All Defendants)
### (15 U.S.C. § 1114)
### (Trademark Infringement for "Linda Lovelace" and "Deep Throat")

75.     Plaintiff realleges all of the paragraphs set forth above.

76.     Plaintiff (and/or its predecessors) adopted the mark Deep Throat in 1972 and has since used it regularly in interstate commerce for, *inter alia,* a series of motion picture works, all using "Deep Throat" as the title, with the motion pictures subsequent to the first one in 1972 each adding a subtitle.

77.     Plaintiff (and/or its predecessors) adopted the mark Linda Lovelace in 1972 and has since used it regularly in interstate commerce for, *inter alia,* two motion picture works, both using "Linda Lovelace" in the title.  Further, Plaintiff (and/or its predecessors) prominently displaying the mark "Linda Lovelace" in connection with its many "Deep Throat" movies.

78.     Continuously since 1972, Plaintiff has used the marks Deep Throat and Linda Lovelace to identify its products and movies and to distinguish them from those made and sold by others, by, among other things, prominently displaying the marks Deep Throat and Linda Lovelace on its goods, their containers and the displays associated therewith. In addition, Plaintiff has prominently displayed said marks on its motion pictures, point-of-purchase displays, posters and in periodicals distributed throughout the United States as well as on the Internet.

79.     On June 10, 2004, Plaintiff filed an application for registration of the "Deep Throat" mark in the United States Patent and Trademark Office.  On September 13, 2005, said mark was registered in the United States Patent and Trademark Office on the Principal Register under the Act of 1946 covering the use of said mark on pre-recorded videotapes and DVDs featuring adult entertainment programs and movies, registration number 2993913.  Said registration is now outstanding and valid.  A copy of the registration is attached as Exhibit C.

80.     Since on or about 2004, Plaintiff has given notice that its "Deep Throat" mark is registered in the U.S. Patent and Trademark Office by displaying with the mark as used the letter R enclosed within a circle. Defendants know that they are violating Plaintiff's trademark rights.

81.     On February 20, 2009 and on November 30, 2010, Plaintiff filed applications for registration of the "Linda Lovelace" mark in the United States Patent and

Trademark Office. On October 6, 2009 and November 22, 2011, said marks were registered in the United States Patent and Trademark Office on the Principal Register under the Act of 1946 covering the use of said mark on pre-recorded videotapes and DVDs featuring adult entertainment, registration number 3691818, and covering the use of said mark on downloadable films and movies featuring adult entertainment provided via a video-on-demand service, registration number 4095397. Said registrations are now outstanding and valid. Copies of the registrations are attached as Exhibits D and E.

82.     Since on or about 2009, Plaintiff has given notice that its "Linda Lovelace" mark is registered in the U.S. Patent and Trademark Office by displaying with the mark as used the letter R enclosed within a circle. Defendants know that they are violating Plaintiff's trademark rights.

83.     Defendants have infringed, or are poised to infringe, Plaintiff's marks in interstate commerce by various acts, including advertising and distributing *Lovelace*, a movie whose title infringes upon Plaintiff's Linda Lovelace mark, and advertising and promoting *Lovelace* by repeated mention of Plaintiff's Deep Throat movies and mark.

84.     This use of the Deep Throat and Lovelace names and marks by Defendants is without permission or authority of Plaintiff and said use is likely to cause confusion, to cause mistake and to deceive.

85.     This use of the Deep Throat and Lovelace names and marks has been committed with the intent to cause confusion, mistake and to deceive.

86.     As a result of their infringement upon Plaintiff's marks, Defendants have profited, and Plaintiffs have been damaged, in an amount to be determined at trial.

17

87.     The injury that Plaintiff has suffered and will continue to suffer unless Defendants' acts of infringement are enjoined are irreparable.

88.     Plaintiff has no adequate remedy at law.

### THIRD CAUSE OF ACTION (All Defendants)
### (15 U.S.C. § 1125(a))
### (Trademark Infringement for "Linda Lovelace" and "Deep Throat")

89.     Plaintiff realleges all of the paragraphs set forth above.

90.     Defendants have caused a motion picture to enter into interstate commerce with the title *Lovelace*, and have advertised that movie by connecting it with the movie and mark Deep Throat.

91.     Said use of "Lovelace" and "Deep Throat" are false designations of origin which are likely to cause confusion, to cause mistake and to deceive as to the affiliation, connection or association with Plaintiff and as to the origin, sponsorship, or approval of *Lovelace* by Plaintiff.

92.     These acts are in violation of 15 U.S.C. § 1125(a), in that Defendants have used in connection with goods and services a false designation of origin, a false or misleading description and representation of fact which is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association with Plaintiff and as to the origin, sponsorship, and approval of Defendants' goods, services and commercial activities by Plaintiff.

93.     As a result of their infringement upon Plaintiff's marks, Defendants have profited, and Plaintiffs have been damaged, in an amount to be determined at trial.

94.     The injury that Plaintiff has suffered and will continue to suffer unless Defendants' acts of infringement are enjoined are irreparable.

95.     Plaintiff has no adequate remedy at law.

18

## FOURTH CAUSE OF ACTION (All Defendants)
### (15 U.S.C. § 1125(c) - Trademark Dilution for "Linda Lovelace" and "Deep Throat")

96. Plaintiff realleges all of the paragraphs set forth above.

97. The Deep Throat and Linda Lovelace marks are strong and distinctive, have long been used in connection with the goods on which they appears, have long been the subject of substantial advertising and promotion, have been used and advertised throughout the United States, are widely recognized by consumers and those in the trade, are in substantially exclusive use by Plaintiff and are federally registered, as alleged above.

98. Plaintiff's marks Deep Throat and Linda Lovelace are recognized by the general consuming public of the United States as a designation of source for the goods of Plaintiff and are therefore famous marks. The acts of Defendants alleged herein were commenced from a time after Plaintiff's marks became famous.

99. Defendants have made use of Linda Lovelace and Deep Throat as marks in connection with the movie *Lovelace,* which Defendants have sold and transported in United States interstate commerce.

100. Defendants' use of *Lovelace* as a title for their movie, and Defendants' mention of Deep Throat in advertising *Lovelace,* creates a likelihood of association with Plaintiff's famous marks Linda Lovelace and Deep Throat.

101. Defendants' acts are in violation of 15 U.S.C. §1125(c) in that they are likely to cause dilution by blurring the distinctiveness of Plaintiff's famous marks Linda Lovelace and Deep Throat, all to the irreparable injury to and damage of Plaintiff.

102. Defendants' acts are also in violation of 15 U.S.C. §1125(c) in that they are likely to cause dilution by tarnishment by harming the reputation of Plaintiff's famous marks Linda Lovelace and Deep Throat, all to the irreparable injury to and damage of Plaintiff.

103.    Defendants committed these acts willfully and with the intent to create an association with Plaintiff's famous marks. Defendants willfully intended to trade on the recognition of Plaintiff's famous marks. Defendants willfully intended to harm the reputation of the famous marks.

104.    The injury that Plaintiff has suffered and will continue to suffer unless Defendants' acts of dilution are enjoined are irreparable.

105.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in their favor and against Defendants as follows:

A.    Awarding Arrow an injunction prohibiting Defendants from displaying, distributing, advertising, promoting or in any way marketing *Lovelace*.

B.    Awarding Arrow an Accounting of all profits and revenues from *Lovelace*.

C.    Awarding Arrow compensatory damages in an amount to be determined at trial but believed to be not less than $10,000,000.00;

D.    Awarding Arrow pre-judgment and post-judgment interest on such damages;

E.    Awarding Arrow the costs of this action;

F.    Awarding Arrow attorneys' fees;

G.    Awarding Arrow punitive damages in an amount to be determined at trial; and

H.     Awarding Arrow such other and further relief as the Court deems just and proper.

Dated:     August 6, 2013

MANDEL BHANDARI LLP
11 Broadway, Suite 615
New York, New York 10004
(212) 269-5600

By:   _____
Evan Mandel