UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

...................................................................X

ARROW PRODUCTIONS, LTD.,                    Index No. 13 Civ. 5488 (TPG)

            Plaintiff,

    -against-

THE WEINSTEIN COMPANY LLC, et al.,

            Defendants.

...................................................................X


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, ATTORNEYS' FEES, AND COSTS


PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Telephone:  (212) 421-4100
*Attorneys for Defendants*


*Of Counsel:*
Tom J. Ferber (tferber@pryorcashman.com)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ......................................................................1

FACTS ...........................................................................................................2

    A.   *Deep Throat*: Its Story, Its Success and The Ensuing Controversy ............................2

    B.   *Lovelace* ...........................................................................6

    C.   Plaintiff's Claims ...........................................................8

ARGUMENT .................................................................................................11

I.    ARROW'S COPYRIGHT CLAIM IS PRECLUDED BY
    THE FAIR USE DOCTRINE AS A MATTER OF LAW ................................11

    A.   The "Purpose and Character of the Use"
        Weighs Decidedly In Defendants' Favor ....................................14

    B.   The "Effect of the Secondary Use Upon the Potential Market"
        for Plaintiff's Work Factor Weighs Decidedly in Defendants' Favor ........................16

    C.   The Nature of the Copyrighted Work ........................................17

    D.   The Amount and Substantiality of the Portion Used ...........................18

II.    PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE
    DISMISSED AND ATTORNEYS' FEES AWARDED ................................19

III.   PLAINTIFF'S LANHAM ACT CLAIMS FAIL AS A MATTER OF LAW ....................20

    A.   Plaintiff's Lanham Act Claims Are
        Precluded By Rogers v. Grimaldi ........................................20

        1.   The Title "*Lovelace*" Has Clear Artistic Relevance To The Film's Story ........21

        2.   *Lovelace's* Title Is Not Explicitly Misleading ...............................22

    B.   References To Linda Lovelace and *Deep Throat* Are Nominative Fair Uses ............24

CONCLUSION................................................................................................26

i

## TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(s)**

Bill Graham Archives v. Dorling Kindersley Ltd.,
    448 F.3d 605 (2d Cir. 2006)..........................................................15, 17, 18

Blanch v. Koons,
    467 F.3d 244 (2d Cir. 2006)...................................................................14, 18

Brownmark Films, LLC v. Comedy Partners,
    682 F.3d 687 (7th Cir. 2012) ........................................................................12

Campbell v. Acuff-Rose Music,
    510 U.S. 569 (1994)..............................................................................14, 16, 18

Cariou v. Prince,
    714 F.3d 694 (2d Cir. 2013).............................................................. passim

Castle Rock Entertainment v. Carol Publishing Group,
    150 F.3d 132 (2d Cir. 1998)...................................................................13, 15

In re Cooper,
    254 F.2d 611 (C.C.P.A. 1958) .....................................................................23

Dastar Corp. v. Twentieth Century Fox Film Corp.,
    539 U.S. 23 (2003)........................................................................................23

Dillinger v. Electronic Arts, Inc.,
    No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS 64006
    (S.D. Ind. June 16, 2011) ............................................................................22

E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,
    547 F.3d 1095 (9th Cir. 2008) ...........................................................21, 22, 24

ETW Corp. v. Jireh Publishing, Inc.,
    332 F.3d 915 (6th Cir. 2003) .......................................................................22

Eastland Music Group, LLC v. Lionsgate Entertainment, Inc.,
    707 F.3d 869 (7th Cir. 2013), cert. denied, No. 12-1501, 2013 U.S. LEXIS 5502
    (U.S. Oct. 7, 2013).......................................................................................23

Hofheinz v. A&E Television Networks,
    146 F. Supp. 2d 442 (S.D.N.Y. 2001) aff'd w/o opinion, No. 01-7904, 2002 U.S.
    App. LEXIS 13314 (2d Cir. May 13, 2002) ...........................................13, 15

**CASES**                                                                 **PAGE(s)**

Louis Vuitton Mallatier S.A. v. Warner Brothers Entertainment Inc.,
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ....................................................................21, 22

Mattel, Inc. v. MCA Records,
    296 F.3d 894 (9th Cir. 2002) ...........................................................................21, 22, 23

Maxtone-Graham v. Burtchaell,
    803 F.2d 1253 (2d Cir. 1986) ...........................................................................................13

Muller v. Twentieth Century Fox Film Corp.,
    No. 08 Civ. 02550 (DC), 2011 U.S. Dist. LEXIS 98248 (S.D.N.Y. Aug. 22, 2011) ........20

New Era Publ'ns. International ApS v. Carol Publishing Grp.,
    904 F.2d 152 (2d Cir. 1990) .............................................................................................15

New Kids on the Block v. New America Public,
    971 F.2d 302 (9th Cir. 1992) .......................................................................................24, 25

Rin Tin Tin, Inc. v. First Look Studios, Inc.,
    671 F. Supp. 2d 893 (S.D. Tex. 2009) .............................................................................24

Rogers v. Grimaldi,
    875 F.2d 994 (2d Cir. 1989) .................................................................................20, 21, 22, 23

Roxbury Entertainment v. Penthouse Media Group, Inc.,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009) ...........................................................................23

Sofa Entertainment v. Dodger Products,
    709 F.3d 1273 (9th Cir. 2013) ................................................................................ passim

Tiffany (NJ) Inc. v. eBay, Inc.,
    576 F. Supp. 2d 463 (S.D.N.Y. 2008), aff'd in part, 600 F.3d 93 (2d Cir. 2010) ............24

## **STATUTES**                                                          **PAGE(s)**

Fed. R. Civ. P. 12(c) ..............................................................................................1

15 U.S.C. § 1114 ..............................................................................................10, 11

15 U.S.C. § 1125(a) ..........................................................................................10, 11

15 U.S.C. § 1125(c)(3)(A) ......................................................................................24

17 U.S.C. § 107 ..............................................................................................10, 14

17 U.S.C. § 107(2) ..................................................................................................17

17 U.S.C. § 107(3) ..................................................................................................18

17 U.S.C. § 107(4) ..................................................................................................16

17 U.S.C. § 505 ..................................................................................................19, 26

Defendants The Weinstein Company LLC, Millennium Films, Inc., Nu Image, Inc., Animus Films, LLC, Untitled Entertainment, Inc., Eclectic Pictures, Inc., Avi Lerner and Laura Rister (collectively "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings dismissing the Complaint of Arrow Productions, Inc. ("Arrow" or "Plaintiff") in its entirety, and for an award of attorneys' fees and costs.

## PRELIMINARY STATEMENT

Arrow's claims are an affront to the rights of artistic expression under the First Amendment and represent a cynical effort to chill speech which Plaintiff deems either to be critical of its infamous 1972 pornographic film *Deep Throat* or to be in competition with a film project which Arrow hopes to develop itself.

Arrow owns *Deep Throat*, the pornographic film about a woman whose search for sexual gratification leads her to a doctor who promptly diagnoses her unusual problem and tells her that the sexual pleasure she seeks can be achieved if she performs the act which made the film famous – and made its title part of sexual vernacular.

As Plaintiff acknowledges, *Deep Throat* was celebrated in 1970s pop culture and has also been the subject of extensive controversy.  It was the subject of numerous criminal and civil proceedings, of public discussions about the exploitation of women in the porn industry, and of testimony at the 1986 Meese Commission on Pornography.  Much of this controversy surrounded the treatment of its star, Linda Lovelace, who later said that her ex-husband, Chuck Traynor, had coerced her, with physical abuse and threats at gunpoint, into her participation in the film, as well as prostitution and other acts.

Defendants' film, *Lovelace*, gives a two-pronged look at Linda Lovelace's life and the

success of *Deep Throat*. First, it tells the story of how Linda Lovelace met and married Traynor, came to make *Deep Throat* and assume the pseudonym by which she was internationally known, and achieved fame when it became a hit the likes of which the porn industry had never known. Then it tells the story behind that story, including the behind-the-scenes terror Linda Lovelace faced from her controlling and abusive husband.

Plaintiff alleges that, by reenacting the filming of, and public reaction to, certain scenes from *Deep Throat* as it tells Linda Lovelace's story, *Lovelace* infringes its copyright.  Arrow further claims that the very use of the name "Lovelace" and references to *Deep Throat* and Linda Lovelace infringe its rights under the Lanham Act.

As Plaintiff's earlier claim letters reveal, however, its real objective is to stifle any discussion or project concerning *Deep Throat* or Linda Lovelace which it does not control.  (See, e.g., Complaint at Ex. H and ¶¶36-38, 41-44, 62-66.)  A comparison of *Deep Throat* and *Lovelace* compels the conclusion that Defendants' film violates none of Arrow's rights under either the Copyright Act or the Lanham Act.  Plaintiff's efforts to twist and misuse these claims to impede the very sort of informative, critical and transformative speech about the important social issues addressed in *Lovelace* must all be dismissed as a matter of law and Defendants should be awarded their attorneys' fees and costs.

## FACTS

### A.    ***Deep Throat*: Its Story, Its Success and The Ensuing Controversy**

*Deep Throat*, which was released in 1972, was allegedly "a watershed moment for American culture" that "changed American mores regarding pornography." (Complaint at ¶20.) As Plaintiff summarizes it, *Deep Throat* was about a woman – Linda Lovelace – who can "achieve sexual satisfaction [only] by performing oral sex" "because her clitoris is in her throat."

(Id. at ¶60.)

*Deep Throat* enjoyed enormous commercial success for a  "hard core" pornographic film (or "blue movie," as Walter Cronkite described it[1]).  It also received extensive attention in the media.  While some, like Plaintiff, saw the film "as a defining moment in the cultural and sexual revolution,…others label[led] it a cheap and nasty exercise in exploitation." (Ex. D to Answer.)  It depicted Linda Lovelace's struggle with the above-described anatomical anomaly and her desire, as she repeatedly tells her roommate, Helen, to hear "bells ringing, dams bursting [and] bombs going off."  (See *Deep Throat* DVD, Ex. DD to Answer.)  After an orgy arranged by Helen fails to produce the hoped-for result, Helen suggests that Linda see Dr. Young, a "psychiatrist."  There are explicit depictions of genitalia and sex – as well as some sophomoric humor – as Dr. Young diagnoses Linda's problem and suggests that she try performing "deep throat" fellatio – on him, for a start.  Linda indeed hears "bells ringing, dams bursting and bombs going off," and is so thrilled with the result that she offers to become Dr. Young's sex slave.  Instead, he makes her a visiting therapist for his patients (but also continues to have sex with her).  When the last of these patients both professes his love for Linda and reveals that he is sufficiently well-endowed to satisfy her – *i.e.*,  she hears "bells ringing, dams bursting and bombs going off" when she performs oral sex on him – she agrees to marry him.

Dubbed "the most profitable smut film in history," *Deep Throat* was described as "porno chic" by *The New York Times*.  Countless celebrities were reported to have seen it, including without limitation Johnny Carson, Mike Nichols, Truman Capote, Warren Beatty, Nora Ephron, Bob Woodward and even the Vice President of the United States – Spiro Agnew. (Complaint at ¶20; Answer at ¶20 and Exhibits A, B, C and R.)  The success of the film was reported to have "made Linda Lovelace a household name" (Ex. G to Answer) and caused the term "deep throat"

---

[1] See clip from CBS Evening News at beginning of *Lovelace*, Ex. EE to Answer.

to "enter[ ] the vernacular as a synonym for oral sex" and to "become a cultural buzzword." (Ex. C to Answer at 5; Ex. D to Answer at 2.)[2]

As Plaintiff points out, the release of *Deep Throat* saw "ensuing obscenity litigation" across the nation. (Complaint at ¶40.)  The dozens of cases concerning *Deep Throat* were later listed in the Final Report of Attorney General Edwin Meese's Commission on Pornography ("Meese Commission"). (Answer at ¶40 and Ex. Q at Q6 – Q21.)  Despite – or perhaps aided by the notoriety of – these legal challenges, it was widely reported that *Deep Throat*, which had cost somewhere between $25,000 and $40,000 to produce, generated hundreds of millions in revenue – perhaps as much as $600 million. (See, e.g., Exhibits C, D, F and G to Answer.)

The Complaint does not dispute that "extensive controversy [ ] has surrounded the film." (Complaint at ¶38.)  Much of this controversy concerns not just the highly publicized legal proceedings regarding *Deep Throat*, but repeated reports referencing its "mob backers," Anthony Peraino Sr. and Louis Peraino of the Colombo crime family.  (See, e.g., Exhibits D, F and G to Answer.)  It was reported that *Deep Throat* "gave the Mafia its most lucrative business since Prohibition." (Ex. C to Answer.)  The Meese Commission reported: that Joseph, Anthony and Louis Peraino of the Colombo family "became millionaires as a result of 'Deep Throat'" (Ex. Q to Answer at Q49); that Anthony and Joseph Peraino were convicted of conspiracy to distribute *Deep Throat*, together with Gerard Damiano, its director (id. at Q39); that Joseph Peraino invested proceeds from the film in drug smuggling (id. at Q42, Q49); and it took note of reports which indicated that the Perainos later coerced Damiano into selling his interest in the film for a paltry $25,000 (id. at Q61).

*Deep Throat* was the subject of even more controversy when its star, known to the public

---

[2] Readers and views of "All The President's Men" are also familiar with the use of "deep throat," which was "Bob Woodward's appropriation of the title as the code name for his secret Watergate source." (Ex. G to Answer.)

by her stage name, Linda Lovelace, later stated that her participation in the film had been the product of coercion and abuse at the hands of her controlling ex-husband, Chuck Traynor.  Two of the books authored by Linda Lovelace – "Ordeal" and "Out of Bondage" (see Exs. H and I to Answer) – detailed this abuse.[3]  Other authors, and even government reports, addressed the coercion and exploitation of women in connection with the production of pornographic films, with a focus on Linda Lovelace and *Deep Throat*.[4]  The Meese Commission's Report referred to Chuck Traynor's abuse of Linda Lovelace in several chapters (see Ex. Q to Answer at Q23, Q26 and Q28), and her testimony before the Meese Commission – in which she stated "virtually every time someone watches that movie, they're watching me being raped" – has been referenced in numerous articles, including in recent years.  (See, e.g., *Guardian* article dated June 22, 2009, Ex. D to Answer; *Hollywood Reporter* article dated Feb. 8, 2013, Ex. R to Answer.)

  A 2008 article entitled "Deep Throat started a debate that still continues 36 years on" discussed Linda Lovelace, "the world's first international porn star," and *Deep Throat*'s "cultural status" in terms of "feminist opinion" regarding pornography and the film's "relationship to freedom of expression," and said of Linda Lovelace:

> Linda Lovelace was regarded as the "best advertisement" for pornography
> because the mainstream appeal and acceptance of X-rated films could be traced to
> the stunning success of Deep Throat.  She was the "worst advertisement" because
> she revealed later that she had been forced to appear in the film by her abusive
> husband, and went on to become the heroine of the anti-porn lobby.

Thus, *Deep Throat*, and Linda Lovelace's role in it, have been the subject of controversy and public debate, nationally and internationally, from its release 41 years ago to the present.

---

[3] Linda Lovelace later claimed that an earlier book purportedly authored by her, "Inside Linda Lovelace" (see Ex. K to Answer), was actually written by (or under the control of) Chuck Traynor.

[4] See, e.g., "The Complete Linda Lovelace: A Deeper-Than-Deep Look At America's First Porn Queen" (Ex. L to Answer, published in 2013; previously published in 2001 as "The Complete Linda Lovelace).  See also "Inside Linda Lovelace's Deep Throat: Degradation, Porno Chic and The Rise of Feminism" (Ex. S to Answer).

**B.**     ___Lovelace___

Defendants' film, *Lovelace*, which is a mainstream (*i.e.*, R-rated, rather than pornographic) biographical film, addresses this controversial subject from two perspectives. First, it depicts:

- how the young Linda Lovelace (then known as Linda Boreman) was seduced by and came to marry Chuck Traynor;

- how, after being arrested in connection with prostitution at his bar, Traynor had Linda audition for Gerard Damiano, "Butchie" Peraino and Anthony Romano – who would be the director, producer and financier, respectively, of *Deep Throat*;

- the making of *Deep Throat*, including Linda preparing for the film, meeting co-star Harry Reems (who played Dr. Young), and the filming of certain scenes – including her interaction with Damiano, Peraino, Romano and other actors during the filming;[5]

- cast, crew, director and producers partying at night after filming, and hearing noises coming from Linda and Chuck's room, which they assume are sexual sounds;

- Peraino and Damiano coming up with the pseudonym "Linda Lovelace" – to the consternation of Chuck, who does not like "Traynor" being dropped from Linda's name;

- the release of *Deep Throat*, with enthusiastic audience reactions to certain scenes;

- *Deep Throat* becoming such a hit and pop cultural reference point that even Bob Hope and Johnny Carson work it into their routines; and

---

[5] At the time of the hearing on Plaintiff's motion for a TRO, Defendants' counsel had not yet had an opportunity to watch *Lovelace*, as was therefore unable to bring this two-tier telling of Linda Lovelace's story to the Court's attention. After watching just one of the allegedly objectionable reenactments, the Court stated: "What this shows is something far different from the original Deep Throat, and that is a production with cameramen and so forth…. It is a use, but very different from what appears in the original." (Transcript of Aug. 7, 2013 hearing at 14.) Defendants respectfully submit that a complete viewing of *Lovelace* – including the behind-the-scenes re-telling of the story described below – demonstrates that these uses are even more transformative than was evident from the excerpts viewed at the TRO hearing.

- a celebrity-laden private screening of *Deep Throat* hosted by *Playboy*'s Hugh Hefner – at which Linda Lovelace is herself treated like an A-list celebrity – with Linda bowing to an appreciative audience at the end.

After this initial telling of Linda Lovelace's story, that story is retold from the behind-the-scenes perspective.  Six years after the above events, Linda is taking a polygraph test, at her publisher's request, in connection with a book she has written about her life with Chuck Traynor. The film then shows many of the same events previously portrayed, but depicts the abuse that Linda suffered, including:

- on their wedding day, Chuck virtually rapes Linda;

- Chuck forces Linda into prostitution at a night club;

- Linda seeks refuge at her parents' house, but her mother, a strict adherent of obeying one's husband, insists she return to Chuck;

- when Linda tells Chuck she can no longer do what he wants, he forces her with threats and abuse;

- the noise that everyone had heard coming from Chuck and Linda's hotel room during the filming of *Deep Throat* is revealed to have been Chuck beating Linda;

- Chuck abuses Linda further when he learns that she had spoken directly with the producer about her salary on a potential sequel;

- Chuck exploits Linda's fame with "Lovelace Enterprises," which features Linda Lovelace sex toys and a putative autobiography which he is writing in her name;

- Chuck has borrowed money from *Deep Throat* financier Anthony Romano, who presses Chuck for payment;

- at Hugh Hefner's private, celebrity screening of *Deep Throat*, Hefner makes a sexual

7

overture to Linda; Chuck is furious at the attention Linda is getting;

- later, Chuck grabs Linda and takes her to a "party," where he forces her, at gunpoint, to prostitute herself to five men;

- the next morning, Linda sneaks out to meet with Anthony Romano, who learns that Chuck has been beating Linda; Linda tells Romano that she can't do any more porn; Linda takes refuge in a hotel room;

- Chuck, high on cocaine, pursues Linda, gun in hand, but is greeted by Romano, who beats Chuck and tells him to stay away from Linda;

- back in the "present" (*i.e.*, six years later), Linda is remarried and living in Long Island with her new husband and young son when she learns that she passed her publisher's polygraph test;

- Linda appears on the Phil Donohue Show, where she is introduced as "the woman who starred in what has been called the *Gone With The Wind* of porn" – Linda Lovelace; Linda attributes her life in porn to Chuck Traynor, who was "a charmer when [she] first met him," but…;

- Linda reunites with her parents, with her son and husband in tow;

- As the film ends, text states that Linda became a spokeswoman against pornography and domestic violence for 20 years; that Traynor went on to marry porn film star Marilyn Chambers; that Linda died in a car accident in 2002; and that Traynor died of a heart attack shortly thereafter.

**C.**     **Plaintiff's Claims**

Plaintiff Arrow, as the alleged successor to the entity which produced *Deep Throat* and registered it with the U.S. Copyright Office, claims to be in the business of licensing the

intellectual property rights in *Deep Throat*.  (Complaint at ¶¶21, 27.)[6]  The Complaint repeatedly refers to, but does not define, "the *Deep Throat* brand," and states that Arrow jealously guards this "brand."  (*Id*. at ¶¶3, 29, 34, 36-37, 39-41, 62.)  Thus, Plaintiff claims, when a filmmaker expresses interest in licensing footage from, or other intellectual property pertaining to, *Deep Throat*, Arrow considers "how the [other filmmaker's] work will affect the *Deep Throat* brand," and licenses only those proposed uses which Arrow concludes will not reflect negatively on it or on "the *Deep Throat* brand."  (*Id*. at ¶¶36-37.)

Arrow states that it is "particularly sensitive" about such licensing "given the extreme controversy that has surrounded" *Deep Throat*.  (Id. at ¶38.)  Arrow has licensed a play and a proposed film "about the making of *Deep Throat* and about the ensuing obscenity litigation" entitled *The Deep Throat Sex Scandal*.  (*Id*. at ¶40.)  Arrow also licensed, and has an unspecified interest in, a proposed biographical film to be entitled *Inferno*, which was supposed to star Lindsay Lohan as Linda Lovelace.[7]  (Id. at ¶42.)

Plaintiff complains, however, that when the entertainment industry press began reporting in 2010 that Defendants were producing *Lovelace*, funding for *Inferno* "dried up."  (*Id*. at ¶44.)[8] In December 2010, entities involved with the *Inferno* project wrote to defendant Nu Image, claiming that Defendants' "similar themed motion picture" would cause their project "severe damage," and demanded that Defendants cease "any use of the motion picture 'Deep Throat' and the name and likeness of 'Linda Lovelace'" in Defendants' film.  Nu Image rejected the claim. (*See* Ex. F to Complaint.)[9]  In November 2011, Arrow's counsel again wrote to Defendants,

---

[6] Neither the Complaint nor the exhibits thereto indicate how Arrow acquired ownership of the copyright in *Deep Throat*.

[7] The full title of the film has been stated to be "Inferno: A Linda Lovelace Story."  <u>See</u> Ex. U to Answer.

[8] The Complaint makes no mention of Lindsay Lohan's much-publicized problems with substance abuse and legal authorities, which were reported to have been the cause of her departure from Arrow's planned film project.  (See Answer at ¶44 and Ex. W.)

[9] Arrow's counsel sent a similar letter to defendant Laura Rister, one of *Lovelace*'s producers, in December 2010. (Ex. G to Complaint.)

claiming that Arrow owned, *inter alia*, trademark rights in "Linda Lovelace" and "Deep Throat," stating that Arrow had previously licensed a film about Linda Lovelace (*i.e.*, *Inferno*), and demanding that Defendants "cease and desist all activities relating to Linda Lovelace and Deep Throat," effectively claiming a monopoly on speech concerning a public figure and an infamous film.[10] (Ex. H to Complaint.)  Counsel for Nu Image and Millennium responded that Defendants' project – "a biographical film about the life of actress Linda Lovelace, including her role in the notorious film 'Deep Throat' and her subsequent activities as an anti-pornography activist" – was protected by the First Amendment and "nominative fair use."  He also stated that the recreation of a scene from *Deep Throat* and the reenactment of the filming of scenes therefrom constituted fair use under §107 of the Copyright Act.  (<u>See</u> Ex. I to Complaint.)

Plaintiff filed this action on August 6, 2013, asserting copyright and Lanham Act claims. Arrow specifically complains about the interviews and negative commentary about *Deep Throat* which attended the film's opening, alleging that "the actors who starred in *Lovelace* have spoken extensively about *Deep Throat*, and have described *Deep Throat* as being a horrible and exploitative film."  Arrow references appearances by *Lovelace*'s stars on the David Letterman show and Comedy Central's Daily Show, in which negative comments were allegedly made about the making of *Deep Throat* and the treatment of Linda Lovelace.  (<u>Id</u>. at ¶¶63-64.)  On August 7, 2013, Plaintiff moved for a temporary restraining order to enjoin the distribution of *Lovelace*, which was to be released on August 9, 2013.  The Court denied Plaintiff's application.

Plaintiff alleges that *Lovelace*'s reenactments of the filming of certain scenes in *Deep Throat* violates its copyright.  Plaintiff's Lanham Act claims allege that Defendants' film infringes Arrow's alleged trademark right in "Linda Lovelace" and "Deep Throat" under 15

---

[10] Thus, in an unguarded moment, Plaintiff revealed its true purpose: it was concerned not with reenactments of scenes from *Deep Throat* in Defendants' biographical film, but with the existence of a competing film project – especially one that would offer a critical perspective.

U.S.C. §§1114 and 1125(a) by virtue of *Lovelace*'s title and promotions which "repeatedly

mention [] Plaintiff's Deep Throat names and mark."  (<u>Id</u>. at ¶¶75-95.)  Arrow also alleges that

Defendants' film dilutes its alleged trademarks.  (<u>Id</u>. at ¶¶97-102.)]

**ARGUMENT**

## I.   ARROW'S COPYRIGHT CLAIM IS PRECLUDED BY <u>THE FAIR USE DOCTRINE AS A MATTER OF LAW</u>

While the opening of Arrow's Complaint misleadingly suggests that *Lovelace* uses *Deep

Throat* "<u>footage</u> without license or permission" (Complaint at ¶2, emphasis added), <u>there is

actually no *Deep Throat* footage in Defendants' biographical film</u> about Linda Lovelace.  Rather,

as Arrow later clarifies, its copyright infringement claim asserts that, in <u>reenacting the filming of

three scenes</u> from *Deep Throat*, *Lovelace* allegedly infringes them.  The three scenes are

described as: (1) the opening scene of *Deep Throat*, "with Linda Lovelace, driving down a road

in a blue Cadillac[11]; (2) an early scene from *Deep Throat* in which "Linda Lovelace walks in on

a man performing oral sex on [her roommate] in a kitchen"[12]; and (3) the scene in which Dr.

Young diagnoses Linda's problem and tells her "that she can achieve sexual satisfaction by

performing oral sex," starting with him. (<u>Id</u>. at ¶¶50, 57-62.)  Plaintiff incorrectly alleges that

"*Lovelace* copies every single detail of this scene."  (<u>Id</u>. at ¶60.)  Not surprisingly, a review of

*Lovelace* demonstrates that this is not the case: its reenactment of the filming of the subject scene

contains no graphic depiction of genitalia or sexual acts – the key elements of the pornographic

*Deep Throat*.[13]  As part of its story about Linda Lovelace, *Lovelace* portrays these scenes being

---

[11] Plaintiff acknowledges that the car in Lovelace is red rather than blue.  (<u>Id</u>. at ¶58.)

[12] The Complaint alleges that the name of the roommate character is "Dolly Sharp." (<u>Id</u>. at ¶59.)  The name of the character is actually "Helen," and she was played by actress Dolly Sharp. (<u>See</u> *Deep Throat* credits, Ex. DD to Answer.)

[13] A comparison of the subject scene in *Deep Throat* with the depiction of the filming of that scene in *Lovelace* shows that the differences in "detail" go beyond the absence of genitalia and fellatio.  There are differences, *inter alia*,  in set dressing, in the nurse's appearance and costume, and in the dialogue, which is significantly shorter and rearranged.  (Nor does the actor playing Harry Reems/Dr. Young in *Lovelace* copy the original's

11

filmed – showing the cameraman, director, producer, etc. – and has original dialogue between Linda and the other actors *about* the filming of *Deep Throat*.

A comparison of the actual content of *Lovelace* and *Deep Throat* demonstrates that these reenactments constitute non-actionable fair use as a matter of law, and Plaintiff's copyright infringement claim should accordingly be dismissed.  See Cariou v. Prince, 714 F.3d 694, 707 (2d Cir. 2013) (citing Rule 12 dismissal of copyright claim in Brownmark[14] with approval, Second Circuit affirms dismissal of copyright claim as a matter of law after side-by-side comparison of two audiovisual works established fair use); accord Sofa Entm't. v. Dodger Prods., 709 F.3d 1273, 1276 (9th Cir. 2013) ("SOFA") ("Dodger is entitled to prevail on its fair use defense as a matter of law . . .").

In Cariou v. Prince, the Second Circuit recently extended the fair use doctrine to uses far more extensive than that at issue here[15] and explained the important constitutional considerations from which the doctrine is derived:

> The purpose of the copyright law is "[t]o promote the Progress of Science and useful Arts . . . ." *U.S. Const., Art. I, § 8, cl. 8.* As Judge Pierre Leval of this court has explained, "[t]he copyright is not an inevitable, divine, or natural right that confers on authors the absolute ownership of their creations. It is designed rather to stimulate activity and progress in the arts for the intellectual enrichment of the public." Pierre N. Leval, *Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1107 (1990)* (hereinafter "Leval"). Fair use is "necessary to fulfill [that] very purpose." *Campbell, 510 U.S. at 575.* Because "'excessively broad protection would stifle, rather than advance, the law's objective,'" fair use doctrine "mediates between" "the property rights [copyright law] establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them- or ourselves by reference to the works of others, which must be protected up to a point." *Blanch, 467 F.3d at 250* (brackets omitted) (quoting Leval at 1109)

---

borrowing/imitation of the "Try it. You'll like it" punch line from the famous Alka Seltzer commercial from the early 1970s.)

[14] Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687 (7th Cir. 2012).

[15] The defendant's works were "appropriation art," most of which represented wholesale copying of the plaintiff's photographs, often with only very minor additions or changes.  714 F.3d at 699-700.

714 F.3d at 705 (emphasis supplied); see also SOFA, 709 F.3d at 1277-78 ("Copyright Act exists 'to stimulate artistic creativity for the general public good'" by granting authors "limited monopoly"; "[h]owever, an overzealous monopolist can use his copyright to stamp out the very creativity that the Act seeks to ignite" and "[t]o avoid that perverse result, Congress codified the doctrine of fair use") (emphasis added) (citations omitted); Hofheinz v. A&E Television Networks, 146 F. Supp. 2d 442, 446 (S.D.N.Y. 2001) (fair use permits appropriation of protected expression in certain circumstances "to promote certain productive uses of copyrighted material") aff'd, w/o opinion, No. 01-7904, 2002 U.S. App. LEXIS 13314 (2d Cir. May 13, 2002), quoting Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1255 (2d Cir. 1986).

Arrow's Complaint makes no secret of its desire to misuse its purported intellectual property rights to stifle public discussion about the making of *Deep Throat* and the exploitation of Linda Lovelace.  Indeed, it openly declares this objective with its repeated references to protecting the dubious "*Deep Throat* brand" and its gripe that interviews with *Lovelace*'s stars have yielded discussions in which *Deep Throat* was referred to as "a horrible and exploitative film."  (Complaint at ¶¶63-64.)  Ignoring the purpose of the copyright law and the fair use doctrine, as articulated in Cariou, Arrow purports to assert "absolute" rights precisely in the hope of blocking the Copyright Act's objective of "stimulat[ing] activity . . . for the intellectual enrichment of the public."  See 714 F.3d at 705.  As was explained in SOFA, fair use is intended to prevent precisely the "perverse result" which Arrow seeks in this action. 709 F.3d at 1278.

As the Court of Appeals summarized it in Cariou: "[t]he 'ultimate test of fair use … is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' … would be better served by allowing the use than by preventing it.'" 714 F.3d at 705, quoting Castle Rock Entm't v. Carol Publ'g Grp., 150 F.3d 132, 251 (2d Cir. 1998).  Section 107 of the

Copyright Act, 17 U.S.C. §107, sets forth four non-exclusive factors which are to be considered with respect to the applicability of the fair use doctrine.  In accordance with the analysis set forth below, which follows the Second Circuit's approach in <u>Cariou</u>, Defendants submit that there can be no doubt that the copyright law's goal would here "be better served by allowing [*Lovelace*'s reenactments] than by preventing [them]."

### A.  The "Purpose and Character of the Use" Weighs Decidedly In Defendants' Favor

The Second Circuit in <u>Cariou</u> described this factor, which concerns the manner in which the plaintiff's work is used by the defendant, as "[t]he heart of the fair use inquiry.'" 714 F.3d at 705, <u>quoting</u> <u>Blanch v. Koons</u>, 467 F.3d 244, 251 (2d Cir. 2006); <u>accord</u> <u>SOFA</u>, 709 F.3d at 1278.  The inquiry focuses on:

> whether the new work merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[,] . . . in other words, whether and to what extent the new work is transformative. . . . [T]ransformative works . . . <u>lie at the heart of the fair use doctrine's guarantee of breathing space</u> . . . .

714 F.3d at 705-06, <u>quoting</u> <u>Campbell v. Acuff-Rose Music</u>, 510 U.S. 569, 579 (1994) ("<u>Campbell</u>") (emphasis added).

*Lovelace*'s reenactments of the filming of scenes from *Deep Throat* are textbook examples of "transformative" uses.  They are used as part of the film's biographical story portraying, *inter alia*: (i) how Linda Lovelace came to meet and marry Chuck Traynor; (ii) her unwittingly audition for the film that would become *Deep Throat*; (iii) her preparing for the film – including her nervousness and, while being made up, attributing bruises to being "clumsy" (thus hiding Traynor's abuse)[16]; (iv) her nervousness at driving for the film's opening credit sequence and her interactions with the director, producer and Reems when he climaxes

---

[16] Bruises are evident on Linda Lovelace's thigh early in *Deep Throat*, when she and her roommate Helen are talking by a swimming pool.  (<u>See</u> Ex. DD to Answer.)

prematurely during the filming of the scene in which Lovelace's character first explores the film's title's sexual act; and (v) audiences' reactions to the film's mixture of pornography and sophomoric humor.  The film thus reenacts the *Deep Throat* scenes at issue for a different purpose from the original, to offer "new insights and understandings . . .," which is "the very type of activity that the fair use doctrine intends to protect for the enrichment of society."  Cariou, 714 F.3d at 706, quoting Castle Rock, 150 F.3d at 142.  Courts have routinely held uses in biographical works to be transformative, and thus fair.  See Hofheinz, 146 F. Supp. 2d at 446 (dismissing copyright claim concerning use of footage from plaintiff's film in biographical film about actor Peter Graves, noting that Second Circuit has established "strong presumption" in defendants' favor in such cases, because "biographies in general and critical biographies in particular" fit "comfortably" within fair use), quoting New Era Publ'ns. Int'l ApS v. Carol Publ'g Grp., 904 F.2d 152, 156 (2d Cir. 1990) (emphasis added); accord Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006) (affirming dismissal of copyright claim concerning use of plaintiff's images in book about the Grateful Dead, noting strong presumption in favor of defendant's biographical work and holding that this factor weighed heavily in defendant's favor); SOFA, 709 F.3d at 1278 (dismissing copyright claim concerning use of Ed Sullivan Show clip of the Four Seasons in Broadway musical as a matter of law; "[b]y using it as a biographical anchor, Dodger put the clip to its own transformative ends") (citation omitted).

As in Cariou, the reenactments of these scenes in *Lovelace* "manifest an entirely different aesthetic . . ." from the original scenes in *Deep Throat*.  714 F.3d at 706.  While *Deep Throat* is a "hard core" pornographic film – replete with "17 scenes of explicit sex," as described by famed

critic Roger Ebert (Ex. B to Answer) – *Lovelace* features Linda Lovelace's personal story, which is one of abuse, exploitation and her eventual triumph.  As in <u>Cariou</u>, therefore, these reenactments are "transformative as a matter of law." <u>Id</u>. at 707.[17]

**B.    The "Effect of the Secondary Use Upon the Potential Market"
        for Plaintiff's Work Factor Weighs Decidedly in Defendants' Favor**

The next fair use factor addressed by the Second Circuit in <u>Cariou</u> was the effect of the defendant's use upon the potential market for the plaintiff's work.[18]  <u>Id</u>. at 708.  The Court stated:

> We have made clear that "<u>our concern is not whether the secondary use suppresses or even destroys the market for the original work</u> or its potential derivatives, <u>but whether the secondary use</u> *usurps* <u>the market of the original work</u>." *Blanch, 467 F.3d at 258* (quotation marks omitted) (emphasis added); *NXIVM Corp. v. Ross Inst., 364 F.3d 471, 481-82 (2d Cir. 2004)….*  Our court has concluded that <u>an accused infringer has usurped</u> *the market* for copyrighted works, including the derivative market, <u>where the infringer's target audience and the nature of the infringing content is the same as the original</u>….  Conducting this analysis, we are mindful that "<u>[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original</u>," even though "<u>the fair use, being transformative, might well harm, or even destroy, the market for the original</u>." *Id*.

Id. at 708-09 (emphasis added) (citations omitted).

As explained by the Second Circuit, this factor weighs decidedly in favor of a finding of fair use in the present case.  As in <u>Cariou</u>, "[Defendants'] audience is very different from [Arrow's] . . .." <u>Id</u>. at 709.  *Deep Throat*'s audience wanted to see those "17 scenes of explicit sex," including, in particular, those depicting the sexual act which gave *Deep Throat* its title.  *Lovelace*'s audience, in contrast, is there to see not explicit sex (the film has none), but the story <u>behind</u> Linda Lovelace's involvement in *Deep* Throat, and it offers, as Arrow acknowledges, a

---

[17] This fair use factor also considers whether a defendant's work has a commercial or nonprofit educational purpose, but as the Second Circuit noted in <u>Cariou</u>, since nearly all of the illustrative purposes in section 107 are conducted for profit, this factor "must be applied with caution . . ." because "Congress 'could not have intended' a rule that commercial uses are presumptively unfair."  <u>Id</u>. at 708, <u>citing</u> <u>Campbell</u>, 510 U.S. at 584.  Thus, the more transformative a defendant's work, the less significant the profit motive will be.  <u>Id</u>.
[18] This factor is set forth at 17 U.S.C. §107(4).

very critical view of that story.  *Lovelace* manifestly does not "usurp" *Deep Throat*'s market, because its "target audience" and "content" are utterly dissimilar.  See id. at 709.

Precisely because *Lovelace*'s reenactment of the subject scenes within the telling of its story is so transformative, it is no "substitute" for *Deep Throat*.  Arrow's allegation that the presence of *Lovelace* has hurt its effort to raise funding for its own film about Linda Lovelace (*Inferno*), and that talk show interviews about *Lovelace* yielded harsh commentary about *Deep Throat* are unavailing.  Under Cariou, "even though the fair use, being transformative, might well harm, or even destroy, the market for the original" (id. at 709) – as Arrow alleges is the effect of *Lovelace* and the cast interviews attending its distribution[19] – that would not make the use any less fair.  Nor does Arrow's claim that its right to license its purported intellectual property enables it to control all presentations regarding *Deep Throat* alter this analysis.  See Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 615 (2d Cir. 2006) ("a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market'" for its work) (citation omitted).

### C.    The Nature of the Copyrighted Work

Under Cariou, the next factor considered is the nature of the copyrighted work.  714 F.3d at 709.  See 17 U.S.C. §107(2).  The two considerations are "(1) whether the work is expressive or creative, …with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished . . .."  Id. at 709-10 (citations omitted).

While Arrow would undoubtedly contend that *Deep Throat* is a creative work, Defendants submit that a film which works a limited story line into a series of graphic depictions

---

[19] Of course, as the Second Circuit noted in Bill Graham Archives, 448 F.3d at 614, n.5, Defendants' film might also "garner[] interest" in *Deep Throat*, making it a boon to the sales of an old and dated film.

of sexual intercourse and fellatio is not the equivalent of the works which have traditionally been deemed to be "creative" under this factor.  Moreover, the Second Circuit has repeatedly held that this factor is of "limited usefulness" where, as here, the plaintiff's work is used for a transformative purpose.  See Cariou, 714 F.3d at 710; Bill Graham Archives, 448 F.3d at 612, citing Campbell, 510 U.S. at 586 ("stating that [this] factor is not 'likely to help much in separating the fair use sheep from the infringing goats' in cases involving transformative copying of 'publicly known, expressive works'").

The second consideration weighs in favor of fair use, since *Deep Throat* has not only been published, but it is over 40 years old, making it precisely the sort of "publicly known" work to which the Supreme Court referred in Campbell.  510 U.S. at 586.

Accordingly, as in Bill Graham Archives and Cariou, this factor is of limited importance in the present case.

### D.      The Amount and Substantiality of the Portion Used

In addressing this factor, which is set forth at 17 U.S.C. §107(3), the Cariou court asked "whether the quantity and value of the materials used [] are reasonable in relation to the purpose of the copying."  714 F.3d at 710, quoting Blanch, 467 F.3d at 257.  The Cariou court noted that, in some instances, the defendant therein had barely altered the plaintiff's photographs at all.  The Court concluded:

> Prince used key portions of certain of Cariou's photographs.  In doing that, however, we determine that in twenty-five of his artworks, Prince transformed those photographs into something new and different and, as a result, this factor weighs heavily in Prince's favor.

Id. (emphasis added).  The same reasoning applies to the present case.  By way of example, Arrow complains that "*Lovelace* copies [ ] the most famous and iconic scene in *Deep Throat* – 'the money shot,' in film industry parlance," referring to Linda's initial visit with Dr. Young.

(Complaint at ¶60.)  *Lovelace*, of course, offers none of that scene's graphic depictions of sexual acts and genitalia – the very elements which a pornographic film audience pays to see.  Rather, it shows Linda explaining her objective – to "hear bells ringing, dams bursting and bombs going off" – which is the oft-repeated dialogue (and imagery)[20] which reflects her mission.  The humor (however sophomoric and limited) of Linda's search as so described is essential to explaining *Deep Throat*'s commercial success.[21]  (Indeed, *Lovelace* later shows audience reaction to it by way of illustrating why *Deep Throat* was received differently than other porn films.)  It is part and parcel of *Lovelace*'s transformative use.  As in Cariou, therefore, this factor favors a finding of fair use.

## II.  PLAINTIFF'S COPYRIGHT CLAIM SHOULD BE DISMISSED AND ATTORNEYS' FEES AWARDED

As in Cariou, the balancing of the above factors weighs overwhelmingly in favor of a finding that *Lovelace*'s reenactments of scenes from *Deep Throat* constitute non-actionable fair use.  Indeed, "[t]his case is a good example of why the 'fair use' doctrine exists."  SOFA, 709 F.3d at 1280.  As in SOFA, Arrow's copyright claim is so palpably without merit and its objective – to inhibit public discourse critical of *Deep Throat* – is so transparently to have a "chilling effect" on Defendants' fair use in creating a new, transformative work, that Defendants should be awarded their fees pursuant to 17 U.S.C. §505.  Such an award would, in keeping with the Copyright Act's objectives, "encourage[] a defendant to litigate a meritorious fair use claim against an unreasonable claim of infringement."  Id. (citation omitted)  Since Arrow's claim is objectively unreasonable (or worse), Defendants should be awarded their costs and attorneys'

---

[20] This dialogue and imagery are used twice early in the *Deep Throat*, when Linda is talking to her roommate, again when she visits Dr. Young, and again at the film's end, when she meets the man who can satisfy her.  (See Ex. DD to Answer.)

[21] Because the content of *Deep Throat* is overwhelmingly pornographic, there are limited scenes which could be reenacted for the purposes of a mainstream, non-pornographic film about it, such as *Lovelace*.

fees.  See, e.g., Muller v. Twentieth Century Fox Film Corp., No. 08 Civ. 02550 (DC), 2011 U.S.

Dist. LEXIS 98248 (S.D.N.Y. Aug. 22, 2011).

**III.   PLAINTIFF'S LANHAM ACT CLAIMS FAIL AS A MATTER OF LAW**

Arrow alleges various violations of the Lanham Act, claiming that *Lovelace*'s title and

references to "Deep Throat" and "Linda Lovelace" violate its purported trademark rights in those

names.  (Complaint at ¶¶83, 90-91, 98-102.)  These claims are all precluded as a matter of law.

*Lovelace*'s use of these names is protected by the First Amendment and Plaintiff's claims are

barred under Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989).  In addition, Defendants'

references to "Linda Lovelace" and "Deep Throat" are non-actionable nominative fair use.

**A.   Plaintiff's Lanham Act Claims Are
        Precluded By Rogers v. Grimaldi**

Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989), concerned director Federico Fellini's

film *Ginger and Fred*.  The film was not about the iconic American film stars Ginger Rogers and

Fred Astaire, but about two fictional Italian cabaret performers who earned their livings by

imitating Rogers and Astaire.  Id. at 996-97.  Rogers alleged that the use of her name in the

film's title violated the Lanham Act.  The Second Circuit held that the First Amendment

"precludes" Lanham Act claims premised upon the title of an expressive work unless the title

"has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance,

unless [it] explicitly misleads as to the source or the content of the work."  Id. at 999 (emphasis

added).  Finding *Ginger and Fred's* title not explicitly misleading as to the source of the film,

and artistically relevant to the film's content, the Court affirmed the dismissal of Rogers's

Lanham Act claim as a matter of law.  Id. at 1000-1005 (reasoning that "the slight risk" that

using Rogers' name "might implicitly suggest endorsement or sponsorship to some people is

outweighed by the danger of restricting artistic expression, and the Lanham Act is not

applicable…. [The title] is clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or services or a collateral commercial product.") (internal citations omitted). Rogers has been extended to the content of expressive works, as well as their titles. See, e.g., Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc., 868 F. Supp. 2d 172, 177 n.9 (S.D.N.Y. 2012) ("Louis Vuitton").

### 1. The Title "*Lovelace*" Has Clear Artistic Relevance To The Film's Story

The Rogers court emphasized that the first element of this test reflects an "appropriately low threshold of minimal artistic relevance . . .." 875 F.2d at 999. This low threshold is necessary in light of First Amendment considerations. See Louis Vuitton, 868 F. Supp. 2d at 178; E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1094, 1100 (9th Cir. 2008) ("only the use of a trademark with no artistic relevance to the underlying work whatsoever does not merit First Amendment protection. In other words, the level of relevance merely must be above zero") (internal citation and quotation marks omitted).

It is beyond dispute that the title *Lovelace* – for a motion picture that tells the story of the porn star known internationally as "Linda Lovelace"[22] – has considerably more than merely "*some* artistic relevance" to the film. See Mattel, Inc. v. MCA Records, 296 F.3d 894, 902 (9th Cir. 2002) ("Mattel") ("The *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity") (emphasis added). The title is artistic expression protected by the First Amendment, since the relevance of "Lovelace" to the content of the Film is self-evident and indisputable.

---

[22] See references to the use of "Linda Lovelace" to identify the actress in question at Point III. B., *infra*.

**2.      _Lovelace_'s Title Is Not Explicitly Misleading**

Like the "relevance" prong of the <u>Rogers</u> test, the "explicitly misleading" prong

preserves First Amendment protections except in extraordinary cases.  <u>See, e.g.</u>, <u>Rock Star</u>

<u>Videos, Inc.</u>, 547 F.3d at 1099-1101.  Under this prong of the test, a work's title is not "explicitly

misleading" absent some affirmative claim by defendant that the work originated with the

plaintiff.  <u>Dillinger v. Electronic Arts, Inc.</u>, No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS

64006, at *22 (S.D. Ind. June 16, 2011) ("Plaintiff points to no explicit misrepresentation—that

fact alone is dispositive of this issue") (<u>citing</u> <u>Rogers</u>, 875 F.2d at 999 and <u>Rock Star Videos, Inc.</u>,

547 F.3d at 1100-1101) (emphasis added).  Arrow does not and could not allege that Defendants

have made any explicit representation that _Lovelace_ originates with or was endorsed by

Plaintiff.[23]  (Nor, of course, would it make any sense for Defendants to do so, given that their

film is directed toward a totally different audience than _Deep Throat_'s.)  Lanham Act claims fail

to satisfy the second prong of the <u>Rogers</u> test when, as here, the the allegations of confusion are

premised upon the title of an expressive work itself.  <u>See e.g.</u>, <u>Mattel</u>, 296 F.3d at 902 (title

"Barbie Girl" could not explicitly mislead consumers that pop song emanated from Barbie toy

manufacturer Mattel).  References to "Linda Lovelace" and _Deep Throat_ in "advertising and

promoting _Lovelace_" (Complaint at ¶83) are similarly non-actionable.  <u>See, e.g.</u>, <u>ETW Corp. v.</u>

<u>Jireh Publ'g, Inc.</u>, 332 F.3d 915, 937 (6th Cir. 2003) (painting of Tiger Woods with other golfing

legends did not explicitly mislead consumers despite use of registered mark TIGER WOODS in

advertising and promotional materials for the painting).

---

[23] As with similar claims that have failed as a matter of law, Arrow's Complaint offers only vague allegations of confusion (<u>see</u> Complaint at ¶¶83-85, 91), rather than any specific allegation that Defendants have made an explicitly misleading statement to dupe consumers into purchasing their product (_i.e._, _Lovelace_) believing it to be Plaintiff's.  <u>See</u> <u>Louis Vuitton</u>, 868 F. Supp. 2d at 181.  For this reason alone, as in <u>Louis Vuitton</u>, Arrow's allegations of confusion are not plausible and do not pass the requisite threshold.  <u>Id.</u> at 182.

22

A work's title can only "explicitly mislead" the public where the it is manifestly intended to affirmatively misrepresent the work's origin or content.  <u>Rogers</u>, 875 F.2d at 999-1001 (explaining that an inclusion of subtitle "an authorized biography," if false, would constitute a misrepresentation sufficient to "explicitly mislead" consumers).  Otherwise, the mere "risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act."  <u>Id</u>. at 999-1001.  <u>See</u> <u>Roxbury Entm't v. Penthouse Media Grp., Inc.</u>, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) ("Mere use, without more, is insufficient to make the use explicitly misleading") (citation omitted).

There is nothing in *Lovelace* from which one could plausibly draw the conclusion that Defendants are explicitly misleading consumers about the film's origin.  As in <u>Rogers</u>, "[t]he title of [Defendants' film] contains no explicit indiction that [Plaintiff] endorsed the [Defendants'] film or had a role in producing it."  <u>Rogers</u>, 875 F.2d at 1001.  As the <u>Mattel</u> court stated: "[c]onsumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer."  296 F.3d at 902 (emphasis added) (citation omitted).  <u>See also</u> <u>Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.</u>, 707 F.3d 869, 872 (7th Cir. 2013) ("The title of a work … can infringe another author's mark only if the title falsely implies that the latter author is its origin"), <u>cert. denied</u>, No. 12-1501, 2013 U.S. LEXIS 5502 (U.S. Oct. 7, 2013), <u>citing</u> <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23 (2003); <u>In re Cooper</u>, 254 F.2d 611, 615-16 (C.C.P.A. 1958) (a "title… identifies a specific literary work… and is not associated in the public mind with the … manufacturer…") (internal quotation marks omitted).

It is Defendants' names and marks – *e.g.*, Millennium Films and Radius TWC (<u>see</u> Ex.

BB to Answer) – not "Lovelace," which identify the film's origin.  See, e.g., Rin Tin Tin, Inc. v. First Look Studios, Inc., 671 F. Supp. 2d 893, 901 (S.D. Tex. 2009) (dismissing Lanham Act claims against film studios in part because "'Defendants' use of the term 'Rin Tin Tin' described the content of the film [].  'Rin Tin Tin' was not a source identifier anywhere on the DVD cover or within the film, itself.  []In fact, the only listed source identifiers on the DVD cover, disc, and within the film, itself, were [defendants] First Look Studios, Nu Image, Inc., M3 Media, Inc., and Millennium Films") (citation omitted).

When measured against the "explicitly misleading" standard, it is not just implausible, but inconceivable, that Defendants' use of "Lovelace" as the title of their film, or references to *Deep Throat* or Linda Lovelace within its story or promotional materials, could "dup[e] consumers into buying a product [i.e., the Film] they mistakenly believe is sponsored by the trademark owner [i.e., the Plaintiffs]." Rock Star Videos, 547 F.3d at 1100 (citation and quotation omitted).  *Lovelace*'s title and content are protected artistic expression and Plaintiff's claims fail as a matter of law.

### B.  References To Linda Lovelace and *Deep Throat* Are Nominative Fair Uses

As discussed above, *Lovelace*'s title serves to describe its subject matter – the actress known as Linda Lovelace – rather than its source of origin.  Similarly, references to Linda Lovelace and *Deep Throat* within the film or its advertising serve no source-denoting function, and therefore do not infringe Plaintiff's alleged trademarks.  These are all non-actionable nominative fair uses of the names of the actress and film, which cannot readily be identified by other names.  See 15 U.S.C. §1125(c)(3)(A); see also New Kids on the Block v. New Am. Pub., 971 F.2d 302 (9th Cir. 1992) ("New Kids"); Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 525-26 (S.D.N.Y. 2008), aff'd in part, 600 F.3d 93 (2d Cir. 2010);.

24

While Linda Lovelace's birth name was Linda Boreman, she was known almost exclusively as "Linda Lovelace," because that was how she was billed in both *Deep Throat* – the film that made her famous – and other works.  Articles about *Deep Throat* identified Linda Lovelace as its star.  (<u>See</u> Exs. A, B, E, F, G, R, T and CC to Answer.)  Books *about* her, and books written (or purportedly written) *by* her, identified her as Linda Lovelace.  ((<u>See</u> Exs. H, I, J, K, L and S to Answer.)  The film "Linda Lovelace for President" – which, like most or all of the above, had nothing to do with Arrow – also referred to her by that name.  (<u>See</u> Ex. P to Answer.)  Plaintiff's own proposed biographical film project – *Inferno*[24] – identifies her as Linda Lovelace.  (<u>See</u> Exs. U, V and W to Answer.)  Finally, long after her porn star notoriety had faded, obituaries referred to her as Linda Lovelace, because that is how she was known to the public.  (<u>See</u> Exs. C, N and O to Answer.)

Similarly, *Deep Throat* can only be identified by its title and, as noted above, it has been the subject of innumerable articles, books, legal proceedings and the Meese Commission Final Report.

As the <u>New Kids</u> court explained, "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark."  971 F.2d at 306.  Such uses involve "a non-trademark use of a mark."  <u>Id</u>. at 307.  As in <u>New Kids</u>, neither Linda Lovelace nor *Deep Throat* is readily identifiably to the public without use of their names, and no more is used in *Lovelace* than is necessary.  Also as in <u>New Kids</u>, and as discussed above, Defendants have done nothing in conjunction with the use of the title *Lovelace* or references to Linda Lovelace or *Deep Throat* within the film's story or advertising to suggest that Arrow is the source or sponsor of *Lovelace*.  Accordingly, *Lovelace*'s title, and its references to Linda Lovelace and *Deep Throat* all constitute nominative fair uses.

---

[24] The title of the film has also been referred to as *Inferno: A Linda Lovelace Story*.  (<u>See</u> Ex. U to Answer.)

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully submitted that Defendants' motion for judgment on the pleadings should be granted and Plaintiff's Complaint should be dismissed in its entirety, with prejudice, and Defendants should be awarded their attorneys' fees and costs pursuant to 17 U.S.C. §505.

Dated: October 15, 2013

PRYOR CASHMAN LLP


By: _____/s/_____
        Tom J. Ferber
7 Times Square
New York, New York  10036
(212) 421-4100

Attorneys for Defendants