UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Arrow Productions, LTD.,

                    Plaintiff,                    13 Civ. 5488

              v.

                                                  **OPINION**

The Weinstein Company LLC, et al.,

                    Defendants.

This is a motion for judgment on the pleadings made by defendants the Weinstein Company, LLC, et al., against plaintiff Arrow Productions.  Plaintiff, an entertainment company that produces and distributes films, owns the copyrights to the well-known pornographic film *Deep Throat* as well as the trademarks "Deep Throat" and "Linda Lovelace."  Plaintiff alleges that in filming the movie *Lovelace*, a biographical account of Linda Lovelace, the star of *Deep Throat*, defendants infringed upon plaintiff's copyright protected material (17 U.S.C. § 107) and violated plaintiff's trademark rights (15 U.S.C. §§ 1114, 1125(a), 1125(c)).

The court enters judgment for defendants and dismisses plaintiff's complaint in its entirety.

1

**Pleadings**

The following facts and allegations are drawn from the pleadings, and the works incorporated by those pleadings—namely, the films *Deep Throat* and *Lovelace*.

### The Controversy

*Deep Throat* is a famous pornographic film replete with explicit sexual scenes and sophomoric humor.  It was released in 1972 and stars Linda Lovelace[1].  The film is about a woman—Linda Lovelace—who cannot achieve an orgasm and undertakes a search for sexual fulfillment.  Along the way, Lovelace meets Dr. Young who diagnoses her unusual problem and tells her that she can only achieve sexual satisfaction by performing oral sex (or, more specifically, the act which is the title of the film) because her clitoris is in her throat.  In the end, Lovelace is finally able to achieve sexual fulfillment.

*Lovelace* is a biographical film that was released in 2013.  It provides a two-pronged look at the tragic life of Linda Lovelace.  First, the film documents Lovelace's marriage to her husband Chuck Traynor, her decision to enter the pornography business, and her development into a cultural icon.  Then, the film provides a behind-the-scenes depiction of Lovelace's life that focuses on the physical and emotional abuse that Traynor inflicted upon her, and the

---

[1] Linda Lovelace's legal name is Linda Boreman.  However, throughout her life she went by the name Linda Lovelace.  Accordingly, in this opinion, the court will refer to her as Linda Lovelace.

manner in which he coerced her into participating in *Deep Throat* and its subsequent marketing.  The film aims to demonstrate how it came to be that Lovelace—once the most famous star of the pornography business—became an outspoken critic of pornography later in her life.  *Lovelace* does not contain any pornographic scenes or nudity.

### *Copyright Claim (Count One)*

Plaintiff alleges that in their film *Lovelace*, defendants have copied the following three scenes from *Deep Throat*: (1) the opening scene in *Deep Throat*, where Lovelace is filmed driving down the road in her Cadillac, (2) the first pornographic scene in *Deep Throat*, where Lovelace walks in on a man performing oral sex on her housemate, and (3) the most famous scene in *Deep Throat*, where Dr. Young diagnoses Lovelace's condition and tells her that she can achieve sexual satisfaction by performing oral sex and suggests that she start with him.  In its complaint, plaintiff alleges that in these three scenes, defendants "have reproduced dialogue word for word, positioned the actors identically or nearly identically, recreated camera angles and lighting, and reproduced costumes and settings."  Compl. ¶ 57.

The court has reviewed both *Deep Throat* and *Lovelace* and below, summarizes the three contested scenes as depicted in each film.

#### (1) Scene of Lovelace Driving

**_Deep Throat_:**  The film opens with Lovelace driving down the road in a blue Cadillac.  While the opening credits are rolling, there are shots of Lovelace from inside and outside of her car.  Lovelace is driving from a promenade along the water back to her home.  During the scene, there is music playing—a version of "Ode to Joy" on the organ—and there is no dialogue.  The scene ends when Lovelace arrives back at her home.

**_Lovelace_:** The directors of _Lovelace_ have provided a behind-the-scenes depiction of the filming of this scene.  This scene occurs roughly thirty minutes into _Lovelace._  At this point in the film, Lovelace has agreed to take part in the filming of _Deep Throat_ and the parties begin by filming this opening scene.

The scene starts with Lovelace driving a red Cadillac in a motel parking lot.  The film-crew—the director, videographer, and sound director—is in the car with her.   Lovelace begins to drive and then slams on the brakes.  Lovelace is clearly nervous.  The director tells her to "drive normally," to which Lovelace responds, "I don't know how I normally drive.  I just drive, you know?"  The director tells her, "Yeah. That's exactly right.  Just drive and pretend we're not here. Okay?"  Lovelace collects herself and then proceeds to drive without a problem.  She drives along the road by the water.  The director tells her that she is "doing beautiful, baby."  The scene then ends.

### (2) First Pornographic Scene

**_Deep Throat_:**  This is the second scene in the film.  Upon arriving back home, Lovelace walks into the kitchen where she finds her housemate, Helen.

There is a man performing oral sex on Helen in plain sight, as Helen sits on the kitchen table.  Helen had recently been grocery shopping and there are groceries on the kitchen table.  Lovelace, apparently unfazed, says to Helen, "that's a pretty sight. I hope that I'm not interrupting anything."  Helen tells Lovelace that she's not interrupting and that the groceries also belong to her. Lovelace then begins to put away the groceries.  Helen asks Lovelace for a cigarette and turns to the man, delivering the punchline of the scene, "mind if I smoke while you're eating?"  Lovelace exits the kitchen and a pornographic scene ensues between Helen and the man in the kitchen.

     ***Lovelace***: This scene is recreated about halfway through *Lovelace*.  Here, defendants have not provided a behind-the-scenes account of the scene. Rather, the scene is shown during a recreated red-carpet screening of *Deep Throat* to a star-studded audience.  Lovelace is seated in a private area with Hugh Hefner, the owner of Playboy Magazine, watching the film and discussing her future.  Defendants cut between shots of the recreated scene and Lovelace speaking with Hefner.

     In the recreated scene, Lovelace once again engages in a conversation with her housemate Helen, while a man is performing oral sex on Helen.  In this filming, Helen is seated on a bar and there are no groceries.  Lovelace is complaining to Helen about her inability to achieve an orgasm.  Lovelace says that "there's got to be more to sex than a lot of little tingles.  There's got to be bells ringing, dams bursting, or bombs going off."  Helen then delivers the

punchline of the scene, "you want to get off or wreck a city."  Upon hearing this line, the audience at the screening erupts in laughter and defendants then cut back to the conversation between Lovelace and Hefner.  Hefner tells Lovelace that she could be a real movie star.

Later in the film, during the behind-the-scenes depiction of the Lovelace story that focuses on her suffering during the filming and marketing of *Deep Throat*, defendants return to this scene.  Here, defendants include the detail that during the screening, Hefner asks Lovelace to perform oral sex on him.  It appears as though he is offering her a quid pro quo—if she performs oral sex on him, he will help her with her career.

### (3) Scene with Dr. Young

***Deep Throat:***  In this scene, Lovelace meets with Dr. Young to discuss her inability to achieve an orgasm.  Dr. Young is an eccentric and quirky man and there is no evidence that he is an actual doctor apart from his title.  His office is in his home and he is assisted by a young nurse, who also doubles as his sexual companion.  During the beginning of the consultation, Dr. Young is blowing bubbles with a children's toy.  Lovelace tells Dr. Young that there must be more to sex than "little tingles" and that she wants "to hear bells, bombs, and dams bursting."  Dr. Young, after returning the bubble toy to the nurse, begins the consultation by examining Lovelace's vagina.  He calls to the nurse for "sterilization" and the nurse returns with a dish of water into which he dips

his fingertips.  Dr. Young begins to examine Lovelace's vagina with a telescope. He then uses his fingers and determines that Lovelace does not have a clitoris.

Dr. Young then examines Lovelace's throat and finds that her clitoris is actually in her throat.  Upon hearing this diagnosis, Lovelace begins to cry.  Dr. Young consoles Lovelace and then encourages her to try engaging in the form of oral sex, for which the film has its name, on him.  He says to her, invoking the famous catch-phrase from the Alka-Seltzer commercial of the time, "try it. You'll like it."  A pornographic scene ensues and Lovelace is finally able to achieve an orgasm.

**Lovelace:** Once again, defendants have provided a behind-the-scenes account of the filming of this famous scene.  Here, the scene is split into two parts—the first half of the scene, or the diagnosis by Dr. Young, is filmed on one day, and the second half of the scene, or the pornographic part of the scene, is filmed on the following day.

During the filming of the diagnosis, defendants set up the scene in such a way that Lovelace, Dr. Young, as well as all of the directors and producers of *Deep Throat* are included.  The scene begins with a producer holding a "clapperboard" and the director shouting "action."  Lovelace tells Dr. Young, who is blowing bubbles during the consultation, that she enjoys having sex, but that there has to be more to sex than just "little tingles."  Lovelace then tells Dr. Young that she wants to hear "bells ringing, dams bursting, bombs going off."  Dr. Young decides to examine Lovelace's throat—he does not

conduct a full physical examination—and determines that her clitoris is in her throat.  Upon hearing this diagnosis, Lovelace begins to cry.  Dr. Young then consoles her.  The director yells "cut" and the filming ends for the day.

The director and the producers are very pleased with the filming, however, they then point to an aggravated Traynor (Lovelace's husband) sitting next to Lovelace.  Traynor is talking to Lovelace, but defendants do not include the details of the conversation.  It is clear that he is intimidating her.  The directors and producers immediately recognize that having Traynor present for the next day's pornographic scene would be very problematic.  Later that day, the producers tell Traynor that they need him to go to Miami tomorrow to pick up more film.  This request is simply an excuse to ensure that Traynor is not present during Lovelace's most important pornographic scenes.  Traynor reluctantly agrees to travel to Miami.

During the signature pornographic scene, once again, both characters as well as all of the directors and producers are filmed.  There is no nudity in the scene.  The scene begins by Dr. Young telling Loveleace, "try it. You'll like it." Lovelace then starts to engage in oral sex.  All of the producers and directors are watching and one of the producers jokes to the others, "we're all gonna win Oscars."  Dr. Young, in this filming, ejaculates prematurely.  The producers are caught by surprise and begin to make fun of him.  It is clear that this is just the first take of the filming of this scene.  Lovelace turns to the producers and sheepishly asks, "I'm really sorry, did I do something wrong?"  The producers

and director reply, "no...no...no."  The scene then ends and cuts to the cast and crew celebrating the completion of the filming.

### *Trademark Claims (Counts Two, Three, and Four)*

Plaintiff has also brought the following three trademark claims against defendants: (1) trademark infringement under 15 U.S.C. § 1114, (2) false designation of origin under 15 U.S.C. § 1125(a), and (3) trademark dilution under 15 U.S.C. § 1125(c).  "Linda Lovelace" and "Deep Throat" are registered trademarks belonging to plaintiff.  In its complaint, plaintiff alleges that defendants have violated 15 U.S.C. §§ 1114, 1125(a), 1125(c) through naming the film "Lovelace" and through referring to "Deep Throat" in *Lovelace* and in the marketing for *Lovelace*.

### Procedural History

Plaintiff filed suit on August 6, 2013.  On August 7, 2013, plaintiff moved this court for a temporary restraining order to enjoin the distribution of *Lovelace*, which was to be released on August 9, 2013.  The court denied plaintiff's application for a temporary restraining order.

### Discussion

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is analyzed under the same standard applicable to a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  See Sheppard v. Beerman, 18 F.3d 147,150 (2d Cir. 1994).

9

Accordingly, judgment on the pleadings is only appropriate if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to relief.  See Id.

## Copyright Claim

The court first considers defendants claim that they did not infringe upon plaintiff's copyright protected material in violation of 17 U.S.C. § 107, because defendants' recreation of the three scenes in *Deep Throat* constitutes fair use.  The court finds that defendants have engaged in the fair use of the copyright protected material.

The fair use doctrine "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity that the law is designed to foster."  Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994).  The Copyright Act provides that the use or limited reproduction of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching… scholarship, or research, is not an infringement of copyright."  17 U.S.C. § 107.  In determining whether the use made of a work in any particular case is fair use, courts consider the following four factors enumerated in the Copyright Act:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

(3) the amount and substantiality of the proportion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)-(4).

The Second Circuit has found that these statutory factors are not requirements and that the party requesting a judgment of fair use need not demonstrate that every factor weighs in its favor. Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013). Instead, the fair use determination is an open-ended and context sensitive inquiry. Id. "The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." Id. If the use of the copyright material is fair, then the defendant need not seek or receive permission from the plaintiff to use the material. FireSabre Consulting LLC v. Sheehy, No. 11-cv-4719 (CS), 2013 WL 5420977, at *7 (S.D.N.Y. Sept. 2013).

The determination of fair use is a mixed question of law and fact. Harper & Row Publishers v. Nation Enterprises, 471 U.S. 539, 560 (1985). Plaintiff argues that this court should not make a fair use determination at this stage in the litigation, because there are factual questions that must be addressed through discovery. The court disagrees. The court is not aware of any authority in this Circuit that prevents it from undertaking a fair use inquiry in a motion for judgment on the pleadings. The Second Circuit has explained that the "fact-driven nature of the fair use determination suggests that a district court should be cautious in granting [dismissal in advance of trial] in this

11

area." See Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir. 1991).

The court appreciates that would there be factual questions in the case, then a

fair use determination would be inappropriate.  However, there is a complete

factual record before the court and discovery would not provide any additional

relevant information in this inquiry.  All that is necessary for the court to make

a determination as to fair use are the two films at issue—*Deep Throat* and

*Lovelace*.  Accordingly, below, the court undertakes a fair use analysis.

### *Purpose and Character of the Use*

The first statutory factor—the purpose and character of the use—is the

heart of the fair use inquiry.  See On Davis v. The Gap, Inc., 246 F.3d 152, 174

(2d Cir. 2001).  "There is a strong presumption in the Second Circuit that this

factor favors the defendant if the allegedly infringing work fits within the

Section 107 preamble uses: criticism, comment, or research."  Bill Graham

Archives, LLC. v. Dorling Kindersley Ltd., 386 F.Supp.2d 324, 328 (S.D.N.Y.

2005).  The court in Bill Graham went on to explain that "[b]iographies in

general and critical biographies in particular, fit comfortably within these

statutory categories of uses illustrative of uses that can be fair."  Id. (quoting

New Era Publishing v. Carol Publishing Group, 904 F.2d 152, 156 (2d Cir.

1990)).  Here, there is no doubt that *Lovelace*, which is a critical biographical

work, is entitled to a presumption of fair use.

The more important question under the first factor and in the fair use

analysis more generally, is whether the allegedly infringing work is

transformative—whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Cariou, 714, F.2d at 705 (quoting Campbell, 510 U.S. at 579). Ultimately, transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 579.

Here, the court finds that defendants' use, or recreation, of the three scenes from *Deep Throat* constitutes transformative use, adding a new, critical perspective on the life of Linda Lovelace and the production of *Deep Throat*. *Deep Throat* is a pornographic film containing seventeen scenes of explicit sexual content. Conversely, *Lovelace* is a critical biographical film that documents the tragic story of Linda Lovelace and provides a behind-the-scenes perspective on the filming of *Deep Throat*. It does not contain any nudity. Defendants have recreated the three challenged scenes in order to focus on a defining part of Lovelace's life, her starring role in *Deep Throat*.

In two of the three challenged scenes—the driving scene as well as the scene of Lovelace and Dr. Young—, defendants have provided a behind-the-scenes perspective in order to demonstrate Lovelace's apprehension and unfamiliarity during the filming of *Deep Throat*. These two recreated scenes are markedly different from the originals—they include actors playing the parts of

13

the director, producers, sound directors, and videographers as well as entirely new dialogue surrounding the filming of the shots.  But, most importantly, in these recreated scenes, the producers of *Lovelace* have endeavored to portray Lovelace as an unsuspecting amateur, anxious about her role in the film, and ultimately, susceptible to the influence of her domineering and manipulative husband, Chuck Traynor.

The driving scene in *Lovelace* is entirely different than the driving scene in *Deep Throat*.  In *Deep Throat*, the driving scene does not meaningfully advance the plot of the film; rather, it is a vehicle for displaying the opening credits.  There is no dialogue in the scene.  Conversely, in *Lovelace*, the driving scene is an important scene.  It takes places roughly thirty minutes into the film.  At this point, Lovelace has agreed to take part in the filming of *Deep Throat* and this is the first scene.  There is ample dialogue in the scene that captures Lovelace's anxiety about the filming.  She is clearly nervous and more specifically, she is uneasy about driving while being filmed.  Ultimately, after a few false starts, the director is able to reassure her and the filming begins. But, the defendants have established an important theme—Lovelace is undoubtedly a novice who is unsure about her role in the film, and in need of encouragement and support in order to go forward with the filming.

Similarly, defendants have also transformed the infamous pornographic scene between Dr. Young and Lovelace into a behind-the-scenes account of its

14

young, inexperienced, and susceptible star.[2]  In *Deep Throat*, this is the most famous scene in the movie.  It progresses from a faux-medical consultation to a sexual encounter between Dr. Young and his patient, Lovelace.  However, in *Lovelace*, defendants have recreated this scene to focus on Lovelace's inexperience and her relationship with Traynor rather than on the sexual encounter between Lovelace and Dr. Young.  Defendants have removed the sexually explicit part of Dr. Young's physical examination as well as the famous pornographic scene.

Instead, in *Lovelace*, defendants have split this classic scene into two parts—a behind-the-scenes depiction of the physical examination and then, the subsequent sexual scene.  Lovelace's relative inexperience is evident throughout the filming.  For instance, after Dr. Young ejaculates prematurely, she turns to the directors and in a moment of unintended comedy says, "I'm really sorry.  Did I do something wrong?"  Of course, she has not done anything wrong.

But, perhaps most importantly, through dividing the scene in two, defendants are able to highlight the fraught relationship between Lovelace and

---

[2] Admittedly, defendants have copied parts of the dialogue from *Deep Throat*. For example, defendants have copied the following lines of dialogue: (1) Lovelace telling Dr. Young that she wants to "hear bells ringing, dams bursting, bombs going off," and (2) after recommending that Lovelace engage in a certain type of oral sex, Dr. Young provides the following encouragement, "try it. You'll like it."  However, as the court in <u>Bill Graham Archives</u> explained "it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and <u>occasionally to quote directly from such works</u>."  386 F.Supp.2d at 328 (emphasis added).

Traynor.  After the parties have finished filming the consultation scene and
with the ultimate climatic scene scheduled for the next day, defendants include
a shot of Traynor sitting next to Lovelace.  Defendants do not include any
dialogue between the parties but it is clear that Traynor is lording over Lovelace
and intimidating her.  The producers and director immediately recognize that
this is a problem.  They decide that Traynor needs to be sent away for the
climactic scene between Lovelace and Dr. Young.  Thus, through splitting the
scene in two, defendants are able to continue establishing what will turn out to
be the most important plotline in the film—Traynor's control, abuse, and
manipulation of Lovelace.

In the third recreated scene—the first pornographic shot in *Deep
Throat*—defendants have, once again, filmed a recreated scene in an entirely
different context.  Defendants have not provided a behind-the-scenes account
of the filming of this scene; instead, they have chosen to display the recreated
scene during a star-studded premiere of *Deep Throat*.  The recreated scene
appears on the movie screen before the audience.  The recreated scene
contains material differences from the original—both the dialogue and the set
are completely different.

But more importantly, the recreated scene in *Lovelace* serves an entirely
different purpose from the original pornographic scene in *Deep Throat*.
Defendants have removed all the nudity from the scene and instead, recreated
the scene in order to juxtapose the public's overwhelmingly positive response to

16

the film with Lovelace's simultaneous suffering.  In order to achieve this goal, defendants depict the screening in two separate parts of the film—first, during the story of the filming and marketing of *Lovelace*, which captures the public's positive response to the film, and then, during the behind-the-scenes account, which captures Lovelace's suffering.

During the first depiction of this scene, Lovelace is taken to her seat by Hugh Hefner and along the way, meets celebrities such as Sammy Davis Junior.  Lovelace is seated alone in the balcony with Hugh Hefner and together, they watch the film and discuss Lovelace's future. During the screening, the audience roars with laughter after Helen—Lovelace's friend—responds to Lovelace telling her that that when she has sex, she wants to hear "bells ringing, dams bursting, and bombs going off," by delivering the punchline of the scene, "do you want to get off or wreck a city?"  Defendants cut between shots of the recreated scene, the audience laughing, and Lovelace speaking with Hefner.

Then, during the second telling of the Lovelace story, defendants return to this scene and include the detail that while sitting together alone in the balcony, Hefner attempts to coerce Lovelace into performing oral sex on him.  It appears that he is offering Lovelace a quid pro quo—that he will help her career if she will engage with him sexually.  Ultimately, it is this juxtaposition of the public's overwhelmingly positive reception to the film *Deep Throat* with Lovelace's concomitant, silent suffering during the filming and subsequent

17

marketing of the film that is a central theme in *Lovelace* and that is captured in this two-part scene.

Finally, the first fair use factor—the purpose and character of the use—also requires that the court consider whether the allegedly infringing work has a commercial or nonprofit educational purpose. See <u>Cariou</u>, 714 F.3d at 708. This factor arises when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work. See <u>Id</u>. However, courts are to apply this factor with caution because "as the Supreme Court has recognized, Congress 'could not have intended' a rule that commercial uses are presumptively unfair." <u>Id</u>. (quoting <u>Campbell</u> 510, U.S. at 584). "Instead, the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." <u>Id</u>. Thus, while there is no doubt that defendants created *Lovelace* for commercial purposes, the court does not place very much significance on this part of the first fair-use factor given the transformative nature of the work.

In all, the court finds that the first factor weighs in favor of a finding fair use.

### 2. *Nature of the Copyrighted Work*

The second factor—the nature of the copyrighted work—calls for the "recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to

18

establish when the former works are copied." Campbell, 510 U.S. at 586.  In this analysis, courts consider "whether the work is expressive or creative, with a greater leeway being allowed to a claim of fair use where the work is factual or informational." Cariou, 714 F.3d at 709.

Here, the court finds that the creative and expressive nature of *Deep Throat* places the film within the core of copyright protection and thus, that the second fair use factor favors plaintiff.  However, similar to the commercial nature of defendant's film, this factor "may be of less (or even of no) importance when assessed in the context of certain transformative uses." Bill Graham Archives, LLC., 386 F.Supp.2d at 330 (quoting Castle Rock Entertainment Inc., v. Carol Publishing Group, Inc., 150 F.3d 132, 144 (2d Cir. 1998); see also, Cariou, 714 F.3d at 710   In the end, this factor is rarely found to be determinative. Davis v. The Gap, Inc., 246 F.2d 152, 175 (2d Cir. 2001).

### 3. Amount and Substantiality of the Use

The third statutory fair use factor "asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586 (quoting 17 U.S.C. § 107(3)).  There is both a qualitative and quantitative dimension to this analysis. Bill Graham Archives, LLC., 386 F.Supp.2d at 330.  This factor "favors copyright holders where the portion used by the alleged infringer is a significant percentage of the copyrighted work, or where the portion used is essentially the heart to the copyrighted work."

NXIVM Corporation v. Ross Institute, 364 F.3d 471, 480 (2d Cir. 2004).
Ultimately, the central question in this analysis is whether defendant took no
more than necessary given the creative purpose of the copying.  FireSabre
Consulting LLC, 2013 WL 5420977, at *10.

Here, defendants copied, or recreated, three scenes from the original film
*Deep Throat* in order to provide a behind-the-scenes depiction of the filming
(the driving scene and the Dr. Young scene) as well as to demonstrate the
public's positive reaction to the film (the first pornographic scene).  In all, the
three recreated scenes, which mostly contain original dialogue, last for roughly
four minutes—comparatively, the running time for *Deep Throat* is sixty-one
minutes.  Defendants chose three scenes to recreate and each scene, as
discussed above, serves a distinct and important purpose in telling the story of
Linda Lovelace.  The court finds that defendants did not copy any more than
necessary to achieve its creative purposes.

Along these lines, the court finds that defendants have not copied the
core of plaintiff's film *Deep Throat*.  The heart, or core, of *Deep Throat* is that it
is a pornographic film that in particular, focuses on one type of pornographic
act.  Conversely, *Lovelace* has an entirely different purpose—it is a critical,
biographical film.  Thus, given that the two films have entirely different
purposes, it is impossible that defendants' could have copied the core of *Deep
Throat.*

Accordingly, the court finds that the third factor weighs in favor of a finding of fair use.

### 4. *Effect of the Use on the Market for or Value of the Work*

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Copyright law is concerned with protecting the ability of a copyright holder to exploit the market for his work as well as the markets that the copyright holder could reasonably be expected to enter.  Bill Graham Archives, LLC., 386 F.Supp.2d at 331.  Thus, courts must also consider the harm to the market for derivative works, which are defined as those markets that the creators of the original work would in general develop or license others to develop.  Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 145 (2d Cir. 1998).  In this analysis, "[a] market harm for licensing revenues will only be recognized if the market is traditional, reasonable, or likely to be developed and is not a protected transformative use." Bill Graham Archives, LLC., 386 F.Supp.2d at 333.  The Second Circuit has explained that "by developing or licensing a market for parody, news reporting, education, or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets." Castle Rock Enterprises v. Carol Publishing Group, 150 F.3d 132, 146 n.11 (2d Cir. 1998).

Here, *Lovelace* could not supplant demand for *Deep Throat*, because the two films have entirely different subjects—one is a pornography and the other

is a critical biography.  Instead, the issue in this fourth factor analysis is whether *Lovelace* has harmed the market for derivative works of *Deep Throat*. In its complaint, plaintiff alleges that it had licensed the use of *Deep Throat* to the directors of the film *Inferno*, a film that like *Lovelace*, was to be about the life of Linda Lovelace.  Plaintiff alleges that once the entertainment press began to report on the production of *Deep Throat*, funding for the film *Inferno* came to an end.  Ultimately, *Inferno* was never produced and plaintiff attributes defendants' alleged copyright infringement for this lost licensing revenue.

However, the court finds that plaintiff's claim must fail because defendants' film *Lovelace* clearly constitutes a transformative use of the copyright protected film *Deep Throat*.  Accordingly, plaintiff cannot prevent defendants from entering this fair use market.  See <u>Bill Graham Archives, LLC.</u>, 386 F.Supp.2d at 333; <u>Castle Rock Enterprises</u>, 150 F.3d at 146 n.11.

### *Aggregate Assessment*

In light of the factors discussed above, the court concludes that defendants' recreation of the three scenes from *Deep Throat* constitutes fair use.  Thus, defendants have not infringed upon plaintiff's copyright protected material.

### **<u>Trademark Claims</u>**

Plaintiff has also brought the following three trademark claims against defendants: (1) trademark infringement under 15 U.S.C. § 1114, (2) false

designation of origin under 15 U.S.C. § 1125(a), and (3) trademark dilution under 15 U.S.C. § 1125(a).  The court finds that these three claims fail as a matter of law.

### Trademark Infringement and False Designation of Origin

The standard for establishing a trademark infringement claim under 15 U.S.C. § 1114 is the same as the standard for establishing a false designation of origin claim under 15 U.S.C. § 1125(a). Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company, 799 F.2d 867, 871 (2d Cir. 1986); Twentieth Century Fox Film Corporation v. Marvel Enterprises, Inc., 220 F. Supp.2d 289, 287 (S.D.N.Y. 2002).  In either a claim for trademark infringement or false designation of origin, a plaintiff can establish a prima facie case by showing that defendant's use of plaintiff's trademark is likely to confuse consumers as to the source of defendant's product.  Lois Sportswear, U.S.A., Inc., 799 F.2d at 871.  Accordingly, the court will consider these two trademark claims together.

In its complaint, plaintiff alleges that defendants have infringed upon plaintiff's marks "Linda Lovelace" and "Deep Throat" in violation of 15 U.S.C. § 1114  by "advertising and distributing *Lovelace*, a movie whose title infringes upon plaintiff's Linda Lovelace mark, and advertising and promoting Lovelace by repeated mention of plaintiff's 'Deep Throat' movies and mark." Compl. ¶ 83. Additionally, plaintiff alleges that in violation of 15 U.S.C. § 1125(a), defendants'  "use of 'Lovelace' and 'Deep Throat' are false designations of origin which are likely to cause confusion, to cause mistake and to deceive as to the

affiliation, connection or association with plaintiff as to the origin, sponsorship, or approval of Lovelace by plaintiff." Id. ¶ 91.

Here, defendants' conduct, as alleged, does not constitute trademark infringement, or false designation of origin, because in its complaint, plaintiff fails to plausibly allege that consumers are likely to be confused by defendants' conduct. Pearson Education Inc. v. Allen Air Conditioning Co., et al., No. 08-cv-6152 (KBF), 2013 WL 5870235, at *2 (S.D.N.Y. Oct. 2013). "A pleading that offers labels and conclusions or a formulation recitation of the elements of a cause of action will not do." Pension Benefits Guarantee Corporation ex rel. St. Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc., 712 F.3d 705, 717 (2d Cir. 2013). In its complaint, plaintiff has only set forth conclusory allegations of confusion; it is has not set forth any reason as to why consumers would believe that plaintiff was involved in the production of defendants' film *Lovelace*.

### *Trademark Dilution*

Federal law allows the owner of a "famous mark" to enjoin a person form using "a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by transnishment of the famous mark." 15 U.S.C. § 1125(c)(1). "Dilution by blurring" is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." Id. § 1125(c)(2). The Second Circuit has listed the following as classic examples of trademark dilution by blurring,

"Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns...." <u>Starbucks Corporation v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 105 (2d Cir. 2009).   "Dilution by blurring refers to the whittling away of the established trademark's selling power and value through its unauthorized use by others." <u>Tiffany (NJ) INC. v. eBay Inc.</u>, 600 F.3d 93, 111 (2d Cir. 2010).

In contrast to dilution by blurring, "dilution by tarnishment" is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).   "This generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." <u>Tiffany (NJ) INC.</u>, 600 F.3d at 111 (quoting <u>Deere & Co. v. MTD Prods., Inc.</u>, 41 F.3d 39, 43 (2d Cir.1994)).

Here, in support of its trademark dilution claim, plaintiff has set forth allegations of both dilution by blurring and dilution by tarnishment.  More specifically, plaintiff has alleged that "defendants acts are in violation of 15 U.S.C. § 1125(c) in that they are likely to cause *dilution by blurring* the distinctiveness of plaintiff's famous marks Linda Lovelace and Deep Throat, all to the irreparable injury to and damage of plaintiff." <u>Compl</u>. ¶ 101 (<u>emphasis added</u>).   Similarly, plaintiff has alleged that "defendants' acts are also in violation of 15 U.S.C. § 1125(c) in that they are likely to cause *dilution by tarnishment* by harming the reputation of Plaintiff's famous marks Linda

25

Lovelace and Deep Throat, all to the irreparable injury to and damage of Plaintiff." Id. ¶ 102 (emphasis added).

The court finds that both of plaintiff's trademark dilution claims must fail as a matter of law. As mentioned above, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Pension Benefits Guarantee Corporation ex rel. St. Vincent Catholic Medical Centers Retirement Plan, 712 F.3d at 717 (2d Cir. 2013). Once again, plaintiff has only set forth bare-bones, conclusory allegations in support of these claims that merely recite the elements of the cause of action. With respect to dilution by blurring, plaintiff has not provided any basis for its allegation that Lovelace impairs the distinctiveness of its marks "Linda Lovelace" and "Deep Throat". Along these lines, plaintiffs have also not provided any basis for its claim that Lovelace has tarnished the reputation of its marks "Linda Lovelace" and Deep Throat".

**Attorneys' Fees**

Defendants move for an award of costs and attorneys' fees under 17 U.S.C § 505 of the Copyright Act. A court may award costs to any party (other than the United States), and attorneys' fees to a prevailing party in a copyright action. 17 U.S.C § 505. In determining whether to award attorney's fees, courts are to consider several non-exclusive factors including frivolousness, motivation, objective unreasonableness, and the need to advance considerations of compensation and deterrence. See Muller v. Twentieth

Century Fox Film Corp., No. 08-Civ-02550 (DC), 2011 WL 3678712, at *1 (S.D.N.Y. Aug. 2011) (referencing Fogerty v. Fantasy, 510 U.S. 517, 534 (1994)).  Defendants contend that given that plaintiff's copyright claims are meritless and designed to stifle any public criticism of the film *Deep Throat*, the court should award attorneys' fees.

While the court finds that plaintiff's copyright claims fail as a matter of law, the court does not find that they are so unreasonable as to warrant the award of attorneys' fees.

### Conclusion

The court enters judgment for defendants and dismisses plaintiff's complaint in its entirety.  The court declines to award attorneys' fees to defendants.  This opinion resolves item #9 on the docket.

SO ORDERED.

Dated:  New York, New York
        August 25, 2014

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/14

27